

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-12-2004

# CER 1988 Inc v. Aetna Cslty & Surety

Precedential or Non-Precedential: Precedential

Docket No. 03-2833

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"CER 1988 Inc v. Aetna Cslty & Surety" (2004). *2004 Decisions.* Paper 172.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/172

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2833

C.E.R. 1988, INC.

v.

THE AETNA CASUALTY AND
SURETY COMPANY,

Appellant

On Appeal from the
District Court of the Virgin Islands
Division of St. Croix
D.C. Civil Action No. 97-cv-00065
(Honorable Raymond L. Finch)

Argued May 6, 2004

Before: BARRY, AMBRO, and SMITH,
Circuit Judges

(Opinion filed: October 12, 2004)

Gerald J. Nielsen, Esquire (Argued)
Suite 2850
3838 North Causeway Boulevard
Metairie, LA 70002
        *Attorney for Appellant*

Francis J. D'Eramo, Esquire
Nancy V. Young, Esquire (Argued)
Nichols, Newman, Logan & D'Eramo

1131 King Street, Suite 204
Christiansted, St. Croix
USVI, 00820-4971
        *Attorneys for Appellee*

OPINION OF THE COURT

AMBRO, *Circuit Judge*

We address in this appeal whether the National Flood Insurance Program (the "Program") is sufficiently comprehensive to preempt a state tort suit arising from conduct related to the Program's administration. We conclude that the overarching purpose of the Program—to provide affordable flood insurance in high-risk areas in order to reduce pressures on the federal fisc—would be compromised by state court interference. Thus the plaintiff's state law tort claims are preempted.

**Factual and Procedural History**

The Program is administered by the Federal Emergency Management Agency ("FEMA") pursuant to the National Flood Insurance Act of 1968 ("NFIA"), 42 U.S.C. § 4001, *et seq.* C.E.R. 1988, Inc. ("C.E.R.") seeks state law remedies for improper handling of the Program's Standard Flood Insurance Policy (the "Policy") issued in favor of C.E.R. by defendant Aetna Casualty and Surety Company ("Aetna"). Aetna is a "Write-Your-Own" ("WYO") insurance company, meaning that it is a private insurer authorized by FEMA to provide Policies in its own name. It collects premiums in segregated accounts, from which it pays claims and issues refunds. When the funds are inadequate (as frequently occurs),

Aetna pays claims by drawing on letters of credit issued by the United States Treasury.

C.E.R. purchased a Policy from Aetna to cover Hamilton House, a property in St. Croix. In September 1995 the property was damaged by flooding during Hurricane Marilyn. C.E.R. received an insurance payment of $200,000 as a result of damage to Hamilton House. One year later, in September 1996, the facility again was damaged by flood waters, this time during Hurricane Hortense. C.E.R. filed a claim for $716,916, but the receipts it submitted in conjunction with the claim, documenting repairs made since Hurricane Marilyn, totaled under $20,000.

Given the disparity between the claim amount and the receipt totals, Aetna required C.E.R. to submit a "Comparison Estimate" detailing when the relevant damage occurred. The Comparison Estimate, prepared by an architect, reported new losses of $325,300.55 resulting from Hurricane Hortense. Nonetheless, Aetna's adjustment company refused to consider the estimate and recommended payment in the amount of $25,177.61, minus a $750 deductible. C.E.R. refused the settlement, and Aetna closed its file on the claim, without payment, in March 1997.

In 1997 C.E.R. filed a seven-count complaint against Aetna, alleging contract and tort causes of action, in the United States District Court of the Virgin Islands. Aetna subsequently hired a second adjustment company, which estimated C.E.R.'s losses at $263,757.58. In February 1998 the parties settled C.E.R.'s contract claims for $278,392. T h u s only C.E.R.'s tort claims remain. They allege negligent adjustment of C.E.R.'s insurance claim resulting in lost income and business opportunities, tortious bad faith conduct, and outrageous and reckless conduct entitling C.E.R. to punitive damages. C.E.R. also seeks attorney's fees and costs.

In January 2000, Aetna moved for summary judgment on these claims alleging, among other defenses, that C.E.R.'s territorial law tort claims are preempted by federal law. In April 2001, the District Court denied Aetna's motion, holding that the tort claims were not preempted and that a genuine issue of material fact existed as to whether Aetna had acted in bad faith. Aetna filed a motion for reconsideration of the preemption issue. As an alternative request for relief, it asked the District Court to certify the question for interlocutory appeal in accordance with 28 U.S.C. § 1292(b). The District Court pursued that course. We granted Aetna's petition for permission to appeal in May 2003.[1]

## Discussion

Our preemption analysis turns on congressional intent. We must determine

---

[1] Our standard of review is plenary. *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 167 (3d Cir. 1998) (on rehearing).

whether the purposes of the Program will be jeopardized if disputes involving federal flood insurance policies are governed by state law.[2] Because we have examined this issue in a previous case, *Van Holt v. Liberty Mutual Fire Insurance Co.*, 163 F.3d 161 (3d Cir. 1998) (on rehearing), our role today is limited. Although we left open in *Van Holt* the question of whether the NFIA preempts state law, *id*. at 169 n.6, our reasoning in that case leads us to answer in the affirmative.

**I. Overview of the National Flood Insurance Program**

Congress created the Program to provide standardized insurance coverage for flood damage at or below actuarial rates. *Gowland v. Aetna*, 143 F.3d 951, 953 (5th Cir. 1998). Prior to its enactment, few insurance companies offered flood insurance because private insurers were unable profitably to underwrite flood policies. The Program was intended to minimize costs to taxpayers by "limit[ing] the damage caused by flood disasters through prevention and protective measures." *Van Holt*, 163 F.3d at 165. It is operated by FEMA and supported by the federal Treasury. *Id*. at 165 n.2. The Program encompasses 4.5 million policies aggregating $500 billion dollars of coverage.

In its early years, the Program was administered under what is known as "Part A" of the NFIA. A pool of private insurance companies issued policies and shared the underwriting risk, with financial assistance from the federal Government. As of January 1, 1978, however, the Government bears full responsibility for the Program pursuant to 42 U.S.C. § 4071. Under "Part B" of the NFIA, FEMA "carr[ies] out the program of flood insurance authorized under [the NFIA] through the facilities of the Federal Government." *Id*. The Program is funded through the National Flood Insurance Fund established by FEMA in the United States Treasury.

Congress authorized FEMA to "prescribe regulations establishing the general method or methods by which proved and approved claims for losses may be adjusted and paid for any damage to or loss of property which is covered by flood insurance." 42 U.S.C. § 4019. The resulting regulatory scheme is set out at 44 C.F.R. §§ 61.1-78.14. States have no regulatory control over the Program's operations.[3] *Linder & Assocs. Inc. v.*

---

[2]Because this decision is not specific to the Virgin Islands, we discuss the tensions between federal and state law rather than territorial law. Our analysis, of course, also extends to the latter.

[3]The insurance industry in the United States operates in interstate commerce. States may regulate the insurance industry only to the extent Congress permits. U.S. Const. art. I, § 8, cl. 3. The McCarren-Ferguson Act, 15 U.S.C. § 1011, *et seq.*, grants states this power except where Congress enacts legislation that

*Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999) ("It is well settled that federal common law governs the interpretation of [Policies]. Accordingly, neither the statutory nor decisional law of any particular state is applicable to the case at bar . . . . [W]e interpret the [Policy] in accordance with its plain, unambiguous meaning, remaining cognizant that its interpretation should be uniform throughout the country and that coverage should not vary from state to state.") (quotations omitted).

Pursuant to 42 U.S.C. § 4081(a), FEMA created the WYO program whereby Policies may be issued by private insurers like Aetna. Though FEMA may issue Policies directly, more than 90% are written by WYO companies. These private insurers may act as "fiscal agents of the United States," 42 U.S.C. § 4071(a)(1), but they are not general agents. Thus they must strictly enforce the provisions set out by FEMA and may vary the terms of a Policy only with the express written consent of the Federal Insurance Administrator. 44 C.F.R. §§ 61.4(b),

---

"specifically relates to the business of insurance." 15 U.S.C. § 1012(b). In *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996), the Supreme Court held that the exception for acts relating to the business of insurance should be construed broadly, noting that "[t]he word 'relates' is highly general." *Id*. at 38. Without doubt the NFIA is congressionally-enacted legislation relating to the business of insurance.

61.13(d) & (e), 62.23 (c) & (d). In essence, the insurance companies serve as administrators for the federal program. It is the Government, not the companies, that pays the claims. And when a claimant sues for payment of a claim, "the responsibility for defending claims will be upon the Write Your Own Company and defense costs will be part of the . . . claim expense allowance."[4] 44 C.F.R. § 62.23(i)(6).

Our Court recently evaluated the NFIA in *Van Holt*. In light of the strong federal interests intertwined with the administration of the Program, we concluded that federal courts are the appropriate and exclusive arbiters of Policy-related disputes.

As noted, *Van Holt* is markedly similar to today's case. The plaintiff in *Van Holt* filed successive claims with its WYO insurance provider, Liberty Mutual, for flood damage. Liberty Mutual concluded that the claims were fraudulent and refused to approve the damages claimed from the second flood. The Van Holts sued Liberty Mutual in the United States District Court for the District of New Jersey, alleging that it had committed state law torts. Our Court initially held that the District Court lacked subject matter jurisdiction over the state law

---

[4] 42 U.S.C. § 4072 authorizes suit against the FEMA Director upon the disallowance of a claim. By regulation, the WYO company is sued in place of the FEMA Director.

claims. On rehearing, however, we reversed path, concluding that the District Court had jurisdiction. 163 F.3d at 167.

Our decision turned on the collapse of two distinctions. First, we declined to distinguish between suits against FEMA, over which jurisdiction plainly existed, and suits against WYO companies. Though the language of the statute speaks explicitly only of suits against FEMA, we held that "a suit against a WYO company is the functional equivalent of a suit against FEMA," *id*. at 166, because a WYO company is a fiscal agent of the United States. 42 U.S.C. § 4071(a)(1). Moreover, "FEMA regulations require a WYO company to defend claims but assure that FEMA will reimburse the WYO company for defense costs." *Van Holt*, 163 F.3d at 166 (citing 44 C.F.R. § 62.23(i)(6)). Second, we held that district courts have original exclusive jurisdiction over cases arising from improper handling of Policy claims even if they "do[] not explicitly allege that [the WYO carrier] violated the insurance policy contract." *Id*. at 167. We emphasized that the causes of action in that case, though they "sound[ed] in tort," alleged "impropriety in the investigation and adjustment of [the] insurance claim" and therefore were "intimately related to the disallowance of the[] insurance claim." *Id*. Put differently, we reasoned that a claim may sound in tort but nonetheless be one in contract.

After concluding that federal jurisdiction was proper, we affirmed in *Van Holt* the District Court's award of summary judgment to Liberty Mutual on the merits. *Id*. at 168–69. Although the issue was briefed, we declined to decide whether the NFIA preempts state law claims related to an insurance contract. *Id*. at 169 n.6.

That issue is back and squarely before us today. We must determine whether the federal goals of uniform affordable flood insurance and reduced aggregate pressure on the federal Treasury, which informed our decision in *Van Holt*, counsel extension of our holding in that case to preclude interference with Policies not only by state courts, but also by state law.[5]

## II. Preemption

The reasoning of our decision in *Van Holt* compels the conclusion that state-law claims are preempted by the NFIA. The uniformity touted in that

---

[5]We note that the immediate effect of our decision is limited, as a relevant Policy provision has since been changed. FEMA National Flood Insurance Program, 65 Fed. Reg. 60,758, 60,767 (Oct. 12, 2000) (codified at 44 C.F.R. pt. 61, app. A(1), art. IX). A new regulation, which took effect on December 31, 2000, amends an insured's Policy to include language providing that "all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et seq*.) and Federal common law." *Id.*

5

decision would be seriously jeopardized if state tort claims were permitted to proceed, even if those claims were resolved in federal court. We reasoned there that "Congress would want federal courts to adjudicate disputes over federal flood insurance policies for which the federal government would be responsible." *Van Holt*, 163 F.3d at 167. By the same token, Congress would want federal law to govern those disputes. And what Congress intends is the crux of our preemption analysis.

"'Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law.'" *Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993) (quoting *Maryland v. Louisiana*, 415 U.S. 725, 746 (1981)). The Court may nonetheless conclude that the Program preempts state law under one or more of three theories: express preemption, field preemption (sometimes referred to as "implied preemption"), and conflict preemption. *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 (3d Cir. 2001). This case falls squarely within the third category.

It is easy to glean that federal law expressly preempts state law when a statute or regulation contains explicit language to that effect. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). But when C.E.R. purchased its Policy, no express provision existed.[6] Thus C.E.R.'s claims under review are not expressly preempted. *See, e.g., Scherz v. S.C. Ins. Co.*, 112 F. Supp. 2d 1000, 1004–05 (C.D. Cal. 2000); *Spence v. Omaha Indem. Ins. Co.*, 996 F.2d 793, 796 n.20 (5th Cir. 1993).

While a stronger case, we decline also to rely on field preemption. This form of preemption exists if "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Ligget Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotations and citation omitted). The Fifth Circuit Court of Appeals opined in the seminal case of *West v. Harris*, 573

---

[6]Arguably the Policy now contains such a provision. The amended provision reads: "This policy and all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et seq.*), and Federal common law." 44 C.F.R. pt. 61, app. A(1), art. IX (2002). The principal differences between the current provision and its predecessor are the addition of the term "exclusively" and the express inclusion of disputes arising from claims handling. *Cf.* 44 C.F.R. pt. 61, app. A(1), art. X (1985) ("This policy is governed by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et. seq.*) and Federal common law.").

F.2d 873 (5th Cir. 1978), that "Congress has undertaken to establish a comprehensive flood insurance program under the control of [FEMA] to achieve policies national in scope." *Id.* at 881–82. While the case predates Part B of the statute, its reasoning is only more persuasive given the expansion of federal involvement in the Program.[7] But because conflict preemption is the narrower and, we believe, clearer path, we do not decide whether Congress has sought to occupy the field of federal flood insurance.

Conflict preemption, the final form, occurs "when [1] it is impossible to comply with both the state and the federal law, or [2] when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Green*, 245 F.3d at 222 (citation omitted). Despite the generality of this language, the Supreme

---

[7]In *West*, the Court deemed the plaintiff's case preempted on this basis. However, *West* "did not expressly address whether the NFIA preempts independent state law tort claims; it only ruled on the availability of a state-based remedy for what is directly justiciable under the NFIA, i.e., a breach of contract claim." *Scherz*, 112 F. Supp. 2d at 1006. The holding in *West* encompassed only "the statutory penalty and attorney's fees allowed by state insurance law for arbitrary denial of coverage." *West*, 573 F.2d at 881. More importantly, our Court never adopted *West*'s rule before or after the statute was amended.

Court has urged caution in its application: "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). A court will deem state law preempted only if that is the "clear and manifest purpose of Congress." *Id.* (internal quotations and citation omitted).

Thus the first step in determining whether C.E.R.'s claims are preempted is to evaluate the statute and regulations for evidence of congressional intent. We begin by examining the first, narrower prong of conflict preemption: state law is preempted when it would be impossible simultaneously to comply with state and federal law. In this context, we note that the standards used to analyze ordinary insurance claims differ from those applied to Policy claims. In the realm of private insurance, common law doctrines (such as "reasonable expectations," "notice/prejudice," and "substantial compliance") govern the evaluation of claims. By contrast, a WYO insurer must strictly follow the claims processing standards set out by the federal Government.

The important consequence is that a WYO insurer may be unable to comply both with state law and with the federal guidelines that it is bound to follow. In these cases, state law is preempted. C.E.R. has not, however, alleged that Aetna followed federal law in violation of a conflicting state law doctrine. On the contrary, it has argued that Aetna *failed* to

comply with a federal requirement—specifically, the requirement that "the [c]ompany's [c]laims [d]epartment verifies the correctness of the coverage interpretations and reasonableness of the payments recommended by the adjusters." 44 C.F.R. § 62.23(i)(2).

Accordingly, we rely instead on the second variation of conflict preemption: we conclude that the application of state tort law would impede Congress's objectives. Indisputably a central purpose of the Program is to reduce fiscal pressure on federal flood relief efforts. *See, e.g.*, *Till v. Unifirst Fed. Sav. & Loan Ass'n.*, 653 F.2d 152, 159 (5th Cir. 1981) ("Clearly, the principal purpose in enacting the Program was to reduce, by implementation of adequate land use controls and flood insurance, the massive burden on the federal fisc of the ever-increasing federal flood disaster assistance."). State tort suits against WYO companies, which are usually expensive, undermine this goal.[8] Allowing suits to proceed, Aetna contends, results in one of two consequences—both bad. If FEMA

refused to reimburse WYO carriers for their defense costs, insurers would leave the Program, driving the price of insurance higher. The alternative, remuneration for losses incurred in such suits, would directly burden the federal Treasury.[9] And, indeed, our decision in *Van Holt* relied on the belief that "FEMA reimburses the WYO companies for their defense costs." *Van Holt*, 163 F.3d at 165.

Our understanding that expensive litigation will draw on federal funds is confirmed by FEMA's regulations and policies interpreting and implementing the NFIA. Congress statutorily authorized FEMA to enter into "arrangements" with private insurance companies. 42 U.S.C. §§ 4071(a)(1), 4081(a). FEMA, in turn, specified the terms of these Arrangements in the regulations governing the Program. Among other things, the Arrangement in effect when C.E.R. purchased its Policy provided that FEMA could reimburse a WYO company for "payments as a result of awards or judgments for punitive damages arising under the scope of this Arrangement and policies of flood insurance issued pursuant to this

---

[8] To be sure, the federal Government also has an interest in preventing fraud by its insurers. But because a WYO insurer profits by *paying* a claim, the ordinary rationale for state tort law is largely inapplicable to the Program's context. WYO insurers act as "fiduciary" or "fiscal" agents of the United States. 42 U.S.C. § 4071(a)(1). They receive a flat 3.3% commission on all claims paid.

[9] Congress has authorized reimbursement for "cost[s] incurred in the adjustment and payment of any claims for losses." 42 U.S.C. § 4017(d)(1). Moreover, pursuant to 44 C.F.R. § 62.23(i)(6), "the responsibility for defending claims will be upon the Write Your Own Company and defense costs will be part of the unallocated or allocated claim expense allowance . . . ."

Arrangement provided that prompt notice of any claim for punitive damages [was submitted]." 44 C.F.R. pt. 62, app. A, art. III(D) (1985). The Write-Your-Own Claims Manual issued by FEMA to WYO companies also provided explicitly that the Government would reimburse a WYO company for punitive damages under appropriate circumstances. FEMA, Write-Your-Own Claims Manual 19 (1986 ed.). Thus it appears that FEMA ordinarily will be responsible financially for the costs of defending a lawsuit against a WYO company.[10] The efficiency goals of the Program, on balance, would better be served by requiring claimants to resolve their disputes by means of the remedies FEMA provides.[11]

---

44 C.F.R. pt. 62, app. A, art. III(D)(2) specifies that FEMA will reimburse a WYO company for "payments as a result of litigation [that arise] under the scope of this Arrangement." In other words, we see no inconsistency in holding that FEMA envisioned that claimants could sue WYO insurers, but intended federal law to govern those disputes.

---

[10]Relying on these and similar provisions, C.E.R. argues that FEMA anticipated that WYO insurers would be sued under *state* law for actions arising from their administration of Policies. We reject C.E.R.'s approach because we see no reason why litigation based on improper claims-handling must mean state law litigation. In fact, the updated Policy set out at 44 C.F.R. pt. 61, app. A(1), indicates the contrary interpretation. In its current form, the Policy appears explicitly to preempt state law tort suits, 44 C.F.R. pt. 61, app. A(1), art. IX (2002), but nonetheless contemplates that lawsuits against FEMA and WYO insurers may proceed. Article VII.R provides: "If you [sue us], you must start the suit within one year of the date of the written denial of all or part of the claim, and you must file the suit in the United States District Court of the district in which the insured property was located at the time of loss." 44 C.F.R. pt. 61, app. A(2), art. VII(R). Moreover,

[11]This reasoning is bolstered by FEMA's express statements to this Court in its *amicus* brief in *Van Holt*. While the *Van Holt amicus* brief was produced in conjunction with litigation rather than a rulemaking, the Supreme Court has deemed appellate briefs worthy of deference. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883-84 (2000) ("[T]he agency's own views should make a difference. We have no reason to suspect that the Solicitor General's representation of [the agency's] views reflects anything other than 'the agency's fair and considered judgment on the matter.' The failure of the Federal Register to address pre-emption is thus not determinative.") (citation omitted). *Cf. Horn v. Thoratec Corp.*, 376 F.3d 163, 177 (3d Cir. 2004) ("Our preemption conclusion is reenforced by the informed analysis found in the FDA's *amicus curiae* brief."). FEMA's *amicus* brief in *Van Holt* principally addressed the disruption to the Program that would result from concurrent

9

This analysis is consistent with the decisions of other courts.[12] But we can

jurisdiction, but it also noted the importance of uniformity in the law. Brief for FEMA at 8–9, *Van Holt* (No. 97-5098), *available at* 1998 WL 34104122 ("Under the Panel's reasoning, the 50 States would become co-administrators of the program along with FEMA, a result Congress plainly did not intend when it enacted § 4019 vesting such administrative power in FEMA, and when it specifically amended § 4072 to make federal jurisdiction exclusive . . . .").

[12]The vast majority of courts have found that the NFIA preempts state law. *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 949 (6th Cir. 2002) ("[M]ost courts have consistently found that NFIA preempts state law claims that are based on the handling and disposition of [Policy] claims."). The most notable exception is *Spence v. Omaha Indem. Ins.*, 996 F.2d 793 (5th Cir. 1993). That case, however, arose from misrepresentation in the *procurement* of a Policy. Our case, by contrast, involves misrepresentation in the *adjustment* of a claim made under a Policy. Several courts have distinguished *Spence* on this basis. *See, e.g., Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 513, 521 (D.N.J. 2000) ("Policy procurement is an entirely different creature than claims handling"). We need not decide today whether a case alleging misrepresentation in claims procurement would also be preempted.

reach the same result by a straighter path—we can simply extrapolate from our decision in *Van Holt*. The reasoning proceeds as follows. First, no one disputes that federal law preempts state contract law with respect to the interpretation of Policy language. *Linder & Assocs. Inc. v. Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999) ("It is well settled that federal common law governs the interpretation of [Policies]."). We need make only one logical step to extend this rule to the case at hand—namely, we must hold that a tort claim of the kind alleged by C.E.R. is equivalent to a contractual claim that turns on the interpretation of a Policy. That step we have already taken. *Van Holt* held that a state claim "sounding in tort" but "intimately related to the disallowance of [an] insurance claim" is essentially a contractual claim and therefore within the exclusive jurisdiction of the federal courts.[13] 163 F.3d at 167.

[13]We do not consider Aetna's argument that enforcement of a tort judgment against a WYO company would violate the Appropriations Clause of the United States Constitution, art. I, § 9, cl. 7, because it would burden a program enacted and funded by Congress. Courts ordinarily should not pass on constitutional questions when a decision may be reached on non-constitutional grounds. *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984). While preemption derives from the Supremacy Clause and thus is formally a "constitutional question," *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450

10

U.S. 311, 317 (1981), "the basic question involved in [preemption claims] is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965). Thus we treat preemption as "'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 239 n.2 (3d Cir. 2002) (quoting *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 272 (1977)).

No similar exception applies to the Appropriations Clause, which—though it may entail analysis of a statute—is an unsettled area of constitutional law. *See, e.g.*, *Maryland Dep't of Human Res. v. United States Dep't of Agric.*, 976 F.2d 1462, 1485–86 (4th Cir. 1992) (Hall, J., dissenting)("[C]onstitutional questions will not be decided unless absolutely necessary to a decision of the case . . . . The majority offers no reason why this prudential constraint should be ignored in the case before us. Indeed, although I express no opinion on the merits of the majority's analysis of the Appropriations Clause, it appears to me that this area of the law is far from settled. The uncertainty surrounding the issue counsels even greater restraint.") (quotations omitted). In deciding preemption, we look principally to the text of the statute and to congressional intent. By contrast, the boundaries of Appropriations Clause analysis are as yet undeveloped. A

**Conclusion**

We conclude that C.E.R.'s claims, based on territorial tort law, are incompatible with the objectives of the NFIA and therefore are preempted. We thus reverse the District Court's denial of summary judgment to Aetna and remand to the Court to dismiss with prejudice C.E.R.'s tort claims.

---

decision for Aetna based on the Appropriations Clause would create new law; our preemption decision applies existing law to a regulatory framework.

11