Paul PALMIERI, Plaintiff–Appellant–
Cross–Appellee,

v.

ALLSTATE INSURANCE COMPANY,
Defendant–Appellee–Cross–
Appellant.

Docket Nos. 05–1920–CV(L),
05–3010–CV(XAP).

United States Court of Appeals,
Second Circuit.

Argued: Dec. 20, 2005.

Decided: April 13, 2006.

R. Bertil Peterson, Staff Counsel, Coalition of Landlords, Homeowners & Merchants, Inc., Babylon, NY, for Plaintiff–Appellant–Cross–Appellee.

Gerald F. Kirby, Feldman, Rudy, Kirby & Farquharson, P.C., Westbury, NY, for Defendant–Appellee–Cross–Appellant.

Before: SOTOMAYOR and WESLEY, Circuit Judges, and KAPLAN, District Judge.*

SOTOMAYOR, Circuit Judge:

This contract dispute over a flood insurance policy requires us to determine whether we have jurisdiction to hear claims involving policies issued by private insurers pursuant to the National Flood Insurance Act ("NFIA" or the "Act"), codified at 42 U.S.C. §§ 4001–4129. We hold that 42 U.S.C. § 4072 gives us jurisdiction to hear such claims. We further hold that prejudgment interest may not be awarded against private insurers acting as fiscal agents of the federal government under the NFIA. We also find that partial summary judgment was properly granted to Allstate on the question of whether Palmieri could recover the full replacement cost of his damaged personal property, and to Palmieri on the question of whether he was entitled to the full replacement cost of his damaged home. We therefore affirm.

## BACKGROUND

On October 31, 1991, plaintiff Paul Palmieri's house on the south shore of Long Island suffered heavy flood damage in a massive nor'easter that local newspapers dubbed "the Halloween storm." Roni Rabin, *The Shoreline Slips Away*, NEWSDAY, Nov. 29, 1991, at 4. The storm was as powerful as a hurricane but lingered longer, causing coastal flooding and erosion throughout the oceanfront communities of eastern Long Island. *See Nameless Bully Pummels Island*, NEWSDAY, Nov. 1, 1991, at 3.

Palmieri's house was located in Babylon, New York, on the waters of the Great South Bay, where only a few barrier islands protected it from the Atlantic Ocean and the full fury of the storm. Palmieri's house was insured under a flood insurance policy issued by defendant-appellee-cross-

---

* The Honorable Lewis A. Kaplan, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

appellant Allstate Insurance Company ("Allstate") pursuant to the NFIA. As discussed in more detail below, the NFIA was intended to help property owners in flood-prone areas obtain flood insurance. Understandably, private insurers tend to be reluctant to insure houses in flood-prone areas like Babylon. The NFIA created a program under which the federal government bears the financial risk of flood insurance policies issued and administered by private insurance companies.

Palmieri filed two claims under his policy, one for damage to his house and one for damage to its contents. Allstate reimbursed Palmieri in 1992 for the actual cash value of each, but on each claim it held back the depreciation value, i.e., the difference between the actual cash value and the cost of repairing or replacing the property.[1] In November 1996, Palmieri requested that Allstate reimburse him for the monies held back. In September 1997, after Palmieri had submitted checks and receipts as evidence that he had actually made repairs, Allstate informed Palmieri by letter that it was denying both of his claims for replacement costs.

Allstate refused to pay the cost of repairing Palmieri's house because, it said, Palmieri had failed to comply with certain provisions of the policy in making his claim. Allstate also refused to pay the cost of replacing the contents of Palmieri's house, arguing that the policy did not allow Palmieri to recover the cost of replacing personal property.

Palmieri filed a civil action in Suffolk County Supreme Court seeking to recover the $10,074.28 Allstate had held back. That action was dismissed in December 2001 upon a finding by the state court that the United States District Court had exclusive jurisdiction over the action pursuant to the NFIA. On May 10, 2002, Palmieri commenced the instant action in the United States District Court for the Eastern District of New York. The parties consented to jurisdiction by United States Magistrate Judge Arlene R. Lindsay,[2] who granted partial summary judgment to both parties on March 22, 2005. The magistrate judge concluded that Palmieri was entitled to the depreciation value of his dwelling, but was not entitled to the depreciation value of his personal property. From this judgment the parties now timely appeal and cross-appeal.

## DISCUSSION

The disagreements in this case primarily concern the costs of replacing Palmieri's house and property. The parties agree that Palmieri was entitled to recover the actual cash value of the property destroyed in the flood; the question is whether he could recover the additional costs of replacing it. Palmieri challenges the magistrate judge's refusal to allow him to recover the replacement cost of his personal property. Allstate challenges the magistrate judge's ruling that Palmieri was entitled to the replacement cost of his home. Before we reach the merits of their

1. Allstate paid Palmieri $39,573.37 for flood damage to the house, holding back $2,801. There is some confusion in the record as to whether the $2,801 actually represented the depreciation value, but because neither party raises this issue on appeal, we need not address it here. Allstate also paid Palmieri $26,076.54 for damages to personal property, holding back $7,273.28 for depreciation.

2. Under 28 U.S.C. § 636(c)(1), upon consent of the parties, a designated magistrate judge "may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case."

arguments, we must determine whether we have jurisdiction to hear the case.

## I. JURISDICTION OVER CLAIMS AGAINST PRIVATE INSURERS UNDER THE NATIONAL FLOOD INSURANCE ACT

### A. The National Flood Insurance Program

Recognizing that private insurers were unlikely to provide adequate flood insurance without some federal subsidy, Congress in 1968 created the NFIA, codified at 42 U.S.C. §§ 4001–4129, to provide subsidized flood insurance through private insurers. *See* 42 U.S.C. § 4001(b) ("[M]any factors have made it uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions"). Under the Act, the federal government provides flood insurance subsidies and local officials are required to adopt and enforce various management measures. *See id.* §§ 4002(b)(3), 4012(c), 4022; 44 C.F.R. §§ 60.2–60.7. The National Flood Insurance Program ("NFIP") created by the Act is administered by the Federal Emergency Management Agency ("FEMA") and supported by the federal treasury, which pays for claims that exceed the revenues collected by private insurers from flood insurance premiums. *See Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 165 n. 2 (3d Cir.1998). Congress has authorized FEMA to "prescribe regulations establishing the general method or methods by which proved and approved claims for losses may be adjusted and paid for any damage to or loss of property which is covered by flood insurance." 42 U.S.C. § 4019. The resulting regulatory scheme is set out at 44 C.F.R. §§ 61.1–78.14.

Prior to the NFIA's enactment, "few insurance companies offered flood insurance because private insurers were unable to profitably underwrite flood insurance policies." *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 266 (3d Cir.2004). In its "early years, the Program was administered under what is known as 'Part A' [or the 'Industry Program'] of the NFIA. A pool of private insurance companies issued policies and shared the underwriting risk, with financial assistance from the federal government." *Id.; see also Downey v. State Farm Fire & Cas. Co.*, 266 F.3d 675, 678 (7th Cir.2001) (citing 42 U.S.C. §§ 4051–4056). Under "Part B," known as the "Government Program," the government "run[s] the NFIP itself—offering federally underwritten policies—with the potential for administrative assistance from private insurers." *Downey*, 266 F.3d at 678 (citing 42 U.S.C. §§ 4071–4072). "In 1977, the Secretary of Housing and Urban Development, who ran the NFIP at the time ..., decided that the Industry Program was unworkable and ended it. He then implemented the Government Program, which has continued to the present." *Id.* at 678–79.

■ Pursuant to 42 U.S.C. § 4081(a), FEMA created the Write–Your–Own Program ("WYOP"), which allows private insurers, sometimes called "WYO companies," to issue and administer flood-risk policies under the Government Program. Although FEMA may issue policies directly under the Government Program,

more than 90% are written by WYO companies. These private insurers may act as 'fiscal agents of the United States,' 42 U.S.C. § 4071(a)(1), but they are not general agents. Thus they must strictly enforce the provisions set out by FEMA and may vary the terms of a Policy only with the express written consent of the Federal Insurance Administrator. 44 C.F.R. § 61.4(b), 61.13(d) & (e), 62.23(c) & (d). In essence, the in-

surance companies serve as administrators for the federal program. It is the Government, not the companies, that pays the claims.

*C.E.R. 1988, Inc.*, 386 F.3d at 267; *see also Downey*, 266 F.3d at 679 (noting that under the Government Program, "although private insurers issue the policies, FEMA underwrites the risk. The insurance companies handle administrative business for FEMA by selling policies and processing claims but do little else"). Suits against the FEMA Director upon the disallowance of a claim are authorized by 42 U.S.C. § 4072, and "[b]y regulation, the WYO company [may be] sued in place of the FEMA director." *C.E.R. 1988, Inc.*, 386 F.3d at 267 n. 4; *see also Downey*, 266 F.3d at 679 (citing 44 C.F.R § 62.23(d)). Because Allstate is acting here as a WYO company, we must decide whether we have subject-matter jurisdiction over such a suit.

## B. Subject–Matter Jurisdiction Under § 4072

■ In their original briefs to this Court, both parties asserted that 42 U.S.C. § 4053 gives us jurisdiction over this case.[3] Recognizing that our sister circuits have rejected this view, we ordered the parties to submit supplemental briefs addressing the jurisdictional question. Both parties have thought better of their original positions and now argue that jurisdiction exists under both 42 U.S.C. § 4072 and 28 U.S.C. § 1331. Of course, we have an independent obligation to satisfy ourselves that we have jurisdiction. *See, e.g., Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). We review *de novo* the question of whether subject-matter jurisdiction exists. *See Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 83 (2d Cir.2005).

■ As an initial matter, we note our agreement with the consensus among our sister circuits that § 4053 does not create jurisdiction over suits against WYO companies. *See Van Holt*, 163 F.3d at 166; *Newton v. Capital Assur. Co. Inc.*, 209 F.3d 1302, 1304 (11th Cir.2000); *Downey*, 266 F.3d at 678–80. As the Seventh Circuit noted in *Downey*, § 4053 "enables only claims brought 'under this part,'" *i.e.*, the NFIP as run under Plan A, or the "Industry Program." 266 F.3d at 678–79. Because the Industry Program stopped operating in 1977, the Seventh Circuit found that the insured was "24 years too late to take advantage of § 4053." *Id.* We join our sister circuits in holding that § 4053, which limits its jurisdictional grant to claims brought under a now-defunct program, does not give rise to jurisdiction here.

All of the circuit courts that have considered the issue agree that federal courts have jurisdiction over suits against WYO companies, but they do not agree on whether 42 U.S.C. § 4072 or 28 U.S.C. § 1331 creates it. *See Van Holt*, 163 F.3d at 167 (finding jurisdiction under § 4072

3. The statute provides: "The insurance companies and other insurers which form, associate, or otherwise join together in the pool *under this part* may adjust and pay all claims for proved and approved losses covered by flood insurance in accordance with the provisions of this chapter and, upon the disallowance by any such company or other insurer of any such claim, or upon the refusal of the claimant to accept the amount allowed upon any such claim, the claimant, within one year after the date of mailing of notice of disallowance or partial disallowance of the claim, may institute an action on such claim against such company or other insurer in the United States district court for the district in which the insured property or the major part thereof shall have been situated, and original exclusive jurisdiction is hereby conferred upon such court to hear and determine such action without regard to the amount in controversy." 42 U.S.C. § 4053 (emphasis added).

and § 1331); *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 946–47 (6th Cir.2002) (finding jurisdiction under § 4072); *Downey*, 266 F.3d at 680 (finding that § 4072 did not create jurisdiction, but that § 1331 did); *Newton*, 209 F.3d at 1305 (finding that jurisdiction existed under § 1331 and declining to consider whether it existed under § 4072); *Studio Frames Ltd. v. Standard Fire Ins. Co.*, 369 F.3d 376, 379–80 (4th Cir.2004) (same).

Section § 4072 states that when "the program is carried out as provided in [42 U.S.C. § 4071], the Director [of FEMA] shall be authorized to adjust and make payment of any claims for proved and approved losses covered by flood insurance." The statute includes the following jurisdictional language:

> [U]pon the disallowance by the Director of any such claim, or upon the refusal of the claimant to accept the amount allowed upon any such claim, the claimant, within one year after the date of mailing of notice of disallowance or partial disallowance by the Director, may institute an action against the Director on such claim in the United States district court
> . . . .

*Id.* This case requires us to determine whether an action against the Director's fiscal agent is "an action against the Director" under § 4072.

In *Van Holt*, the Third Circuit held that § 4072 creates subject-matter jurisdiction for claims against WYO insurance companies. 163 F.3d at 167. Accepting the arguments of the United States as amicus curiae, *see id.* at 166, the court noted "several reasons" for finding a suit against a WYO company to be the "functional equivalent of a suit against FEMA":

> First, a WYO company is a fiscal agent of the United States. 42 U.S.C. § 4071(a)(1). Second, FEMA regulations require a WYO company to defend

claims but assure that FEMA will reimburse the WYO company for defense costs. 44 C.F.R. § 62.23(i)(6). Third, an insured's flood insurance claims are ultimately paid by FEMA. After a WYO company depletes its net premium income, FEMA reimburses the company for the company's claims payments. 44 C.F.R. Pt. 62, App. A, Art. IV(A). When a WYO company's proceeds from insurance premiums exceeds its current expenditures, it must pay the excess proceeds to the [Flood Insurance Administration]. 44 C.F.R. Pt. 62, App. A., Art. VII(B). Although a WYO company collects premiums and disburses claims, only FEMA bears the risk under the flood insurance program. Thus, a lawsuit against a WYO company is, in reality, a suit against FEMA.

*Id.* at 166–67 (citation omitted). The court further noted the anomalous results of reading § 4072 as limited to suits against the Director:

> Because FEMA bears the risk and financial responsibility regardless of whether the lawsuit formally names FEMA or a WYO company as the defendant, it would make little sense for Congress to have intended to create original exclusive jurisdiction for suits against FEMA but not for suits in which FEMA's fiscal agent is the nominal defendant.

*Id.* at 167. Therefore, the court concluded that § 4072 "vests the district courts with original exclusive jurisdiction over suits by claimants against WYO companies." *Id.* The Sixth Circuit adopted the reasoning of *Van Holt* in *Gibson*, 289 F.3d at 947.

In *Downey*, the Seventh Circuit took a different view of whether 42 U.S.C. § 4072 creates jurisdiction over suits of this kind. *See* 266 F.3d at 679. The court noted that § 4072 grants "original exclusive jurisdiction" in the district court for actions

"against the Director" of FEMA, not WYO companies. *Id.* "Section 4072 does not mention the [WYO company] or indicate that anyone other than the Director may be sued under this grant of jurisdiction." *Id.* Acknowledging that the Third Circuit's observation that a suit against a WYO company is the functional equivalent of a suit against the Director was "not without force," *id.* at 679, the Seventh Circuit concluded:

> Although a judgment against [the insurer] may come out of the federal treasury—creating a federal *interest*—the only *litigants* are in the private sector. Because we see no good reason to disregard not only the identity of the litigants but also the fact that § 4072 is limited to suits against the Director, we decline to adopt *Van Holt's* reasoning.

*Id.* at 680.

We agree that § 4072 does not expressly indicate that anyone other than the Director may be sued. The ambiguity in § 4072 lies not in the word "Director," however, but in the word "against," which could mean either "having as defendant" or "opposed to." Of course, this suit is "against" the director in the colloquial sense, because it will draw down the federal financial resources he manages. Given this ambiguity, we look to the statutory context and purpose. *See Auburn Hous. Auth. v. Martinez,* 277 F.3d 138, 144 (2d Cir.2002) ("[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute"). We conclude that a broader reading of the statute is appropriate as to suits against WYO companies because a suit against the Director's fiscal agent, for which the federal government bears financial responsibility, is in practical terms a suit "against" the Director.

To hold that a suit against a WYO company is not a suit "against the Director" would be to ignore the structure of the NFIA, under which insurance companies act on behalf of the federal government, and the purpose of the Government Program, which is to ensure that private companies may "serve as administrators for the federal program." *C.E.R. 1988,* 386 F.3d at 267. The federal government exercises control over the terms of NFIA contracts; private insurers "must strictly enforce the provisions set out by FEMA and may vary the terms of a Policy only with the express written consent of the Federal Insurance Administrator." *Id.* at 267 (citing 44 C.F.R. §§ 61.4(b), 61.13(d)-(e), 62.23(c)-(d)). We see no reason to read the phrase "against the Director" to allow suits against the government agency managed by the Director, but not against the companies that manage the agency's NFIA liability under the government's supervision.

■ The general design of the Act also evidences an intent to ensure that claims involving the programs it creates are heard in the federal courts. Section 4053, which applied to the now-defunct Industry Program, vested exclusive jurisdiction in the federal courts over any action brought by an insured against a pool of private insurers. *See* 42 U.S.C. § 4053. Section 4072 similarly provides for exclusive jurisdiction in the federal courts over any action brought by an insured "against the Director." *Id.* § 4072. The statutory framework thus indicates not only that private insurers are to act as fiscal agents of the government in administering the federal program, but also that all claims for benefits under an NFIA policy, whether issued as part of the Industry Program or the Government Program and whether sought from a private insurer or the government, are to be litigated exclusively in federal court.

Accordingly, we join the Third and Sixth Circuits in holding that § 4072 gives rise to jurisdiction over claims against WYO companies. Because we find jurisdiction under § 4072, we need not consider whether 28 U.S.C. § 1331 gives us jurisdiction over this case as a claim based on federal common law. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) ("[F]ederal law governs questions involving the rights of the United States arising under nationwide federal programs."); *Ill. v. Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) ("[Section] 1331 jurisdiction will support claims founded upon federal common law as well as those of a statutory origin.").

## II. THE AWARDS OF SUMMARY JUDGMENT

▮▮▮ We turn now to the substance of the parties' arguments. We review a grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005) (citation omitted). Summary judgment is appropriate pursuant to Federal Rule of Civil Procedure 56(c) when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We have articulated more specific standards applicable in contract actions:

> In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. The mere assertion of an ambiguity does not suffice to make an issue of fact. Ambiguity resides in a writing when—after it is viewed objectively—more than one meaning may reasonably be ascribed to the language used. Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly.

*Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (citations, alterations and quotation marks omitted). The question of whether the language of a contract is ambiguous is a question of law that we review *de novo*. *Albany Sav. Bank, FSB v. Halpin*, 117 F.3d 669, 672 (2d Cir.1997).

### A. Palmieri Is Entitled Only to the Actual Cash Value of His Personal Property

▮▮▮ Palmieri argues that the magistrate judge erred when she concluded that the contract unambiguously limited his recovery for lost personal property to the actual cash value of that property. We agree with the magistrate judge that there is no ambiguity in the terms of the contract denying Palmieri recovery for the depreciation value—*i.e.*, the difference between actual cash value and replacement cost—of his lost personal property.

The provisions of the contract authorizing recovery of replacement costs state bluntly that "[t]hese Replacement Cost Provisions *do not apply* to any mobile home *or personal property (contents)* covered under this policy, nor do they apply to any loss where insured property is abandoned and remains as debris at the property address following a loss." (emphasis added). Palmieri would have us read this language to apply only to the contents of mobile homes, but the contract

clearly refers to "any mobile home *or* personal property." (emphasis added). Even if this provision were ambiguous, all doubts would be removed by the preamble to the Agreement, which states that recovery for damages to personal property is limited to actual cash value:

> We insure you ... to the extent of the actual cash value of the property at the time of loss, but not exceeding: 1. the cost of replacing the insured building at the time of loss with material of like kind and quality and 2. *the actual cash value of any insured personal property at the time of loss.*

(emphasis added). "Actual cash value" is defined in the agreement as "the replacement cost of an insured item of property at the time of the loss, less the value of physical depreciation." The language of the contract is plain. Allstate reasonably denied Palmieri recovery for the depreciation value of his personal property.

Palmieri's brief relies primarily on the text of the Standard Flood Insurance Policy ("SFIP"), a model contract that appears in the regulations interpreting the NFIA. *See* 44 C.F.R. § 61 App. A(1). Palmieri's argument is that the SFIP allows him recovery of the depreciation value. But Palmieri and Allstate did not use the SFIP, and Palmieri has made no attempt to argue that Allstate violated his rights by drafting its own contract, rather than adopting the SFIP. *See* 44 C.F.R. § 61.4(b) ("All flood insurance made available under the Program is subject ... [t]o the terms and conditions of the [SFIP], which shall be promulgated by the [Federal Insurance] Administrator for substance and form, and which is subject to interpretation by the Administrator as to scope of coverage pursuant to the applicable statutes and regulations"). We therefore need not decide whether Allstate acted improperly when it used a contract other than SFIP. *See LoSacco v. City of Middletown,*

71 F.3d 88, 93 (2d Cir.1995) (treating an issue not raised on appeal as waived).

Moreover, even if Allstate violated the regulations by drafting its own contract rather than adopting the SFIP, nothing in the regulations suggests that courts should respond to such a violation by holding the parties to be bound by the terms of the SFIP when neither party agreed to that contract. The terms of Palmieri's policy could not be more clear in limiting his recovery for personal property losses to actual cash value. We therefore decline to apply the terms of the SFIP rather than the unambiguous terms of the policy actually signed by the parties.

Palmieri also directs this Court's attention to the paperwork he exchanged with Allstate. Palmieri filled out a proof of loss form listing the damages to the contents of his house. In a handwritten note on Palmieri's proof of loss form claiming damages to the contents, Allstate indicated that the amount of depreciation—$7,273.28—was "H/BACK [held back] DUE UPON REPLACEMENT."

It is unclear to us whether Palmieri interprets this note as direct evidence of the meaning of the contract or as a waiver of some kind when he argues that "the defendant cannot engage in historical revisionism by retreating from admissions and representations that its own employee made." In either case, we disagree. As to the meaning of the contract, the text is plain on its face. As to the possibility of waiver, a defense based on lack of coverage is not subject to waiver under New York law. *See Albert J. Schiff Assoc. v. Flack,* 51 N.Y.2d 692, 698, 435 N.Y.S.2d 972, 417 N.E.2d 84 (N.Y.1980); *Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 96 (2d Cir.2002). The contract at issue provides that it is governed by federal common law, which generally adopts the relevant state law rule unless there is a significant conflict between the state rule

and a federal interest. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 507, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Palmieri has pointed to no federal interest that would require us to displace New York's rule against waiver in this context, and so we apply the New York rule and hold that Allstate's handwritten note is irrelevant.

In short, Palmieri has shown no reason why we should disregard the plain meaning of the contract, which limits his recovery to the actual cash value of his personal property. Because we agree with the magistrate judge that Palmieri is entitled to no recovery for breach of contract, we also reject his claim for interest on that cause of action.

### B. Palmieri Is Entitled to the Replacement Value of His Home

Allstate's cross-appeal concerns the replacement costs of Palmieri's house, rather than its contents. Allstate argues that the magistrate judge erroneously awarded Palmieri summary judgment for the full replacement cost of the dwelling. The parties agree that the policy allowed Palmieri to recover the full replacement cost of the dwelling—if he properly filed and supported his claim. But Allstate argues that (1) Palmieri failed to claim the replacement cost within 180 days of the loss, and thereby violated a requirement of the policy, and (2) that Palmieri's proofs of loss are insufficient to support summary judgment. We disagree.

### 1. The Timeliness of Palmieri's Claim for Replacement Value of the Dwelling

■ Allstate argues that the policy unambiguously required that Palmieri make any claim for the replacement cost of the dwelling within 180 days of the loss and that Palmieri failed to do so. To show that Palmieri was required to claim replacement value within 180 days of the loss, Allstate relies upon Article VII, Paragraph 6, one of the policy's "Replacement Cost Provisions." Paragraph 6 states, "You may elect to disregard this condition in making claim hereunder, but such election shall not prejudice your right to make further claim within 180 days after loss for any additional liability brought about by these provisions."

The magistrate judge found Paragraph 6 to be "unintelligible." She noted that while Paragraph 6 begins by stating that an insured may "elect to disregard this condition in making [a] claim hereunder," the word "condition" is defined neither within Article VII nor in any other part of the policy. Allstate argues that the phrase "this condition" refers to Paragraph 4, but it is not clear what in Paragraph 4 constitutes a "condition" that the insured might disregard.[4] Further, as the magistrate judge noted, although Paragraph 5 "does not appear to set forth a condition that can be disregarded, a reasonable insured is more likely to assume 'this condition' refers to a 'condition' in Paragraph 5 rather than Paragraph 4." Paragraph 5 deals with which items would be counted in determining the value of the dwelling for purposes of determining what percent of the value was insured. It has nothing to do with any condition that might be disregarded in making a claim.[5]

Moreover, the magistrate judge noted, "the balance of paragraph 6, which states

---

**4.** Paragraph 4 reads as follows:
When the full cost of repair or replacement is more than $1,000 or more than 5% of the whole amount of insurance applicable to said dwelling, we shall not be liable for any loss under paragraph a. or subparagraph b.2) of these provisions unless and until actual repair or replacement is completed.

**5.** Paragraph 5 reads as follows:

that an insured will not be prejudiced from making a 'further claim within 180 days after loss for any additional liability brought about by the provisions' " is equally unclear because the policy failed to define what constituted " 'additional liability brought about by the provision,' or why a 'further claim' would be necessary."

In effect, the magistrate judge concluded that Paragraph 6 was so ill-defined as to be a nullity. If the language was so meaningless as to have *no* reasonable interpretation, then the contract contained no authorization for holding back the $2,801, and summary judgment was appropriate.

Somewhat confusingly, the magistrate judge went on to "undertake[ ] to ascertain the basis of Allstate's intended meaning." She compared the text of the policy to the SFIP, *see* 44 C.F.R. § 61 App. A, and used the text of the SFIP to "fill in the missing blanks" in Allstate's policy. It appears that the magistrate judge used the SFIP only to understand what Allstate might have wanted its policy to mean, and that the magistrate judge did not believe the SFIP in any way governed the insurance policy, but her opinion is not entirely clear on this point.

The SFIP's provisions on replacement costs "clearly set[ ] forth a list of conditions that apply to single-family dwellings entitled to replacement cost coverage," which included a rule that "the company will not pay for the repair or replacement until the actual repair or replacement is *completed.*" (emphasis added). The SFIP

provides that if an insured opted out of waiting for replacement-cost payment until repairs to his or her property were complete, he or she could "make claim under [the] policy for loss to dwellings on an actual cash basis" and then submit an additional claim for "additional liability according to [replacement cost conditions] provided [the insured] notify [the insurance company] of his [or her] intent to do so within 180 days after the date of loss." The court reasoned that Allstate probably intended to incorporate this provision into its own policy: "that is, that Allstate will not pay for the repair or replacement until the actual repair or replacement is completed."

Whether or not Allstate intended its policy to parallel the SFIP, however, the magistrate judge concluded that Allstate's policy did not include language putting Palmieri on notice that he could make a claim on an actual cash basis and "then, within 180 days of the loss, submit a second claim for the balance of the full replacement cost." The magistrate judge found that the policy did not provide a time limit for making repairs and that Palmieri's pursuit of the claim after repairs were completed, even five years after the flooding, was "consistent with a reasonable understanding of his right's [sic] under the policy." Therefore, she granted Palmieri summary judgment as to his claim of reimbursement for $2,801.

Before the magistrate judge, Allstate proffered several interpretations of Paragraph 6 that are not entirely consistent.[6]

---

In determining if the whole amount of insurance applicable to said dwelling is 80% or more of the full replacement cost of such dwelling, the cost of excavations, underground flues and pipes, underground wiring and drains, and brick, stone and concrete foundations, piers and other supports which are below the under surface of the lowest basement floor, or where there is no

basement, which are below the surface of the ground inside the foundation walls, shall be disregarded.

6. Allstate proffered the following interpretations: (1) that the policy requires the insured to make repairs within 180 days of the loss; (2) that the policy requires the insured to submit a claim within 180 days; and (3) that

Allstate now argues that Paragraph 6 means that the insured may disregard his right to claim the full replacement cost without forfeiting his right to claim, within 180 days, anything else owed him or her. Thus, Allstate asks us to read Paragraph 6 as follows:

> You may elect to disregard this condition [*i.e.,* your right to claim the full replacement cost, including depreciation value] in making claim hereunder, but such election shall not prejudice your right to make further claim [*i.e.,* someone who declines to claim depreciation value can still make other claims] within 180 days after loss for any additional liability brought about by these provisions.

■ The question presented is whether the magistrate judge correctly held that no reasonable interpretation of the policy authorized Allstate to hold back the $2,801—in which case summary judgment is appropriate—or whether the policy was "ambiguous and subject to varying reasonable interpretations," in which case "intent becomes an issue of fact and summary judgment is inappropriate." *Thompson*, 896 F.2d at 721. Ambiguous language is "that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Albany Sav. Bank*, 117 F.3d at 673 (internal quotation marks omitted).

We agree with the magistrate judge that no reasonable insured could discern the intended meaning of "You may elect to disregard this condition," because "this condition" has no antecedent. It could be argued that Paragraph 6 creates a 180–day deadline for replacement cost claims regardless of the "disregard this condition" language, because the second half of the sentence seems independently to suggest a 180–day deadline for replacement cost claims: "such election shall not prejudice your right to make further claim within 180 days after loss for any additional liability brought about by these provisions." The fact that no reasonable insured could understand what the word "election" means arguably does not matter, because the election, whatever it is, *does not prejudice* the right to make claims within 180 days. In this sense, the language of Paragraph 6 could be read to imply that some pre-defined right to make claims—limited to 180 days—is unaffected by Paragraph 6.

This interpretation is difficult to support as a matter of contract interpretation and as a matter of common sense. It would be unreasonable to expect insureds to reason through the steps outlined above to deduce that they must make claims within 180 days of the loss, especially because the implication of that interpretation is that the policy denied replacement costs to anyone who could not complete reconstruction of his or her house within six months of the flood. Under Paragraph 4, these replacement costs can be claimed only after replacement is completed, so if the costs must be claimed within 180 days, the repairs must also have been completed within 180 days. No one reasonably reading the contract would expect to find such a drastic limitation of his or her rights buried in such a cryptic paragraph.

Most importantly, Palmieri correctly points out that Paragraph 6 contains no

---

the 180 day period begins running from both the date of loss and the date of payment by Allstate of the claim based on actual cash value. Because Allstate failed to provide evidence to clarify construction of the provision, the court applied the rule of construction whereby ambiguous language is construed against the drafter, *i.e.,* Allstate.

mandatory language. It refers to a right to make further claims within 180 days, but does not say "you must make further claim within 180 days." Allstate's most convincing interpretation suggests that Paragraph 6 references a 180–day deadline, but again the reference has no antecedent. The contract simply does not set such a deadline. Even if we agreed with Allstate that Paragraph 6 might be read to suggest that a 180–day deadline is set forth somewhere in the contract, we would hold that Paragraph 6 unambiguously fails to create it.

In short, we agree with the magistrate judge that no reasonable reader of Paragraph 6 could interpret it to create a requirement that all claims for replacement costs be filed within 180 days of a loss. We therefore affirm the magistrate judge's grant of summary judgment against Allstate on this issue.

### 2. The Adequacy of Palmieri's Evidence of Damages to the Dwelling

Allstate also argues that summary judgment was inappropriately granted to Palmieri as to the replacement costs of the dwelling because Palmieri failed to produce sufficient evidence that the repairs were actually made. The policy provided that Allstate was not liable under the replacement cost provisions "unless and until actual repair or replacement is completed." The parties agree that Palmieri could only recover the replacement cost after repairs were completed. Summary judgment was appropriate if, drawing all inferences in favor of Allstate, the affidavits and exhibits raised no genuine issue of material fact as to the damages claimed. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82 (2d Cir.2004). The question is whether Allstate has raised a genuine issue of material fact as to the cost of repairs to the dwelling.

Allstate argues that Palmieri's affidavits and cancelled checks were insufficient to show, as a matter of law, that Palmieri's costs for repair exceeded the replacement costs that Allstate held back pending completion of repairs. Allstate argues that "anyone looking at those checks could not make a determination whether they were in fact payments for building payments or payments for contents. That is something that the plaintiff would have to prove at trial." But Allstate has offered no evidence that puts into question Palmieri's claim that he spent more than $43,319.89 repairing his house. A party cannot create a genuine issue of material fact simply by asserting that it wishes there to be a trial on the issue.

Attached to Palmieri's motion for summary judgment were processed checks totaling $22,936.97. The checks were accompanied by invoices that appeared to correspond to them, but most of the invoices are illegible. Allstate correctly points out that some of these checks were for furniture or appliances. But other checks appear to have been for dwelling repairs, including a check to "Jarro Building" for $13,236.97. Palmieri submitted a sworn affidavit stating that these checks reflected "replacements costing $7,273.28 or more." Allstate submitted no affidavit or other evidence suggesting this assertion to be false.

Attached to Palmieri's response to Allstate's cross-motion for summary judgment were more checks. Again, Palmieri submitted a sworn affidavit asserting that these checks represented the cost of repairs. These checks total more than the $43,319.89 that Palmieri identified as the reimbursable replacement cost of his house. For example, Palmieri's submissions included checks for $14,736,

$64,051.50, $39,000, and $13,236.97 to Jarro Building, and checks for $10,000, $3,412.39, and $4,932.21 to "WindowRama."

Thus, even if some of the checks were not for home repairs, but for personal property, the others add up to more than the $43,319.89 of repairs that Palmieri would have had to make to be entitled to reimbursement for the full claimed replacement cost. Allstate offered no reason to doubt that the checks discussed above totaled more than the replacement cost of the house. Indeed, it does not even assert that Palmieri failed to make the required repairs. Because Allstate has raised no genuine issue of material fact as to whether Palmieri made the repairs that entitle him to the depreciation value that Allstate held back, summary judgment was properly granted on this issue as well.

### 3. Prejudgment Interest

Palmieri argues that he is entitled to prejudgment interest on his claims for the replacement cost of his house. He cites New York Civil Practice Law and Rules § 5001(a)-(b), which provides for prejudgment interest on breach of contract claims "from the earliest ascertainable date the cause of action existed." *Id.* § 5001(b). As Palmieri's flood insurance policy indicated, the law governing the policy is the NFIA and federal common law. Nothing in the NFIA addresses prejudgment interest, but federal common law typically adopts the relevant state rule, *see Boyle*, 487 U.S. at 507, 108 S.Ct. 2510, which might suggest that we should follow New York law and award interest.

But there is also a general rule that "in the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Library of Cong. v. Shaw*, 478 U.S. 310, 314, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Although the defendant in this case is a private insurer, not the United States, it is the United States that will pay for an award of interest. As the Eleventh Circuit has stated, "the line between a WYO company and FEMA is too thin to matter for the purposes of federal immunities such as the no-interest rule." *Newton*, 245 F.3d at 1311. For substantially the reasons discussed in the opinions of our sister circuits, *see id.; Sandia Oil Co. v. Beckton*, 889 F.2d 258, 261–64 (10th Cir.1989), *Hill v. Nat'l Flood Ins. Prog. & FEMA (In re Estate of Lee)*, 812 F.2d 253, 256 (5th Cir.1987), we hold that the no-interest rule precludes recovery of prejudgment interest in claims against private insurers under the NFIA. Accordingly, Palmieri was not entitled to interest on his claims.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is hereby AFFIRMED.