[878 NYS2d 311]

Castle Village Owners Corp., Appellant, v Greater New York Mutual Insurance Company et al., Defendants, and American International Specialty Lines Insurance Company, Respondent. (And Other Actions.)

First Department, May 5, 2009

### APPEARANCES OF COUNSEL

*William Hart*, Scarsdale, and *Thelen LLP*, New York City, for appellant.

*Drinker Biddle & Reath LLP*, New York City (*Mark D. Sheridan*, of the New Jersey bar, admitted pro hac vice, and *Heather M. Hughes* of counsel), for respondent.

### OPINION OF THE COURT

NARDELLI, J.

The threshold issue in this declaratory judgment action is whether an exclusion in a commercial umbrella liability policy from coverage for the insured's own property can be circumvented by a claim that ameliorative measures had to be effected to the insured's property so as to prevent or cure damage to adjoining property. We conclude, in the factual scenario presented, that the policy provision is unambiguous, and that the policy does not provide coverage for the claim.

Plaintiff, Castle Village Owners Corp., is a cooperative corporation which owns land bounded on three sides by a retain-

ing wall. On May 12, 2005, a large section of the wall on the western perimeter of the parcel collapsed, causing a large quantity of debris, including dirt, benches, boulders and other objects, to fall onto an adjacent sidewalk and roadway. The debris caused damage to passing automobiles and surrounding property, and blocked the sidewalk and a portion of the northbound Henry Hudson Parkway.

Plaintiff's primary liability insurer was Greater New York Mutual Insurance Co. (GNY), which provided coverage up to $1,000,000 per occurrence. Plaintiff also had purchased a commercial umbrella liability policy from American International Specialty Lines Insurance Co. (AISLIC), in the amount of $50,000,000 per occurrence. In pertinent part, however, the AISLIC policy excluded coverage for "property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property."

After the collapse, the City of New York issued an emergency declaration, which required certain immediate remediation steps, including the removal of debris, stabilization of the wall, protection against rainwater, and the installation of a temporary means of protection for vehicular traffic. By letter dated May 16, 2005, the City advised Castle Village:

> "The referenced [section of retaining wall] has been declared unsafe and in imminent peril. It must be repaired or demolished immediately. The responsibility to take such action is yours and, because of the severity of the condition, the work must begin immediately . . . If you fail to do so, the City will perform the necessary work and seek to recover its expenses from you."

In the days following the collapse, the City retained contractors and engineers to clear the site and the surrounding area of debris, and to perform structural work to prevent further collapse and additional debris from falling on the surrounding sidewalks and roadways.

By letter dated July 5, 2005, the City informed Castle Village that its emergency remediation work had been completed, and it made formal demand upon Castle Village for reimbursement of its alleged costs in the amount of $2,163,067. The letter included a payment certification of approximately $1 million to

Trocom Construction Co., the general contractor, for the performance of the "emergency work."

In a letter dated August 5, 2005, Christopher Santulli, then Deputy Borough Commissioner of the City's Department of Buildings, requested plaintiff to provide a work plan for future project tasks, including a solution to remedy permanently the slope and conditions that led to the wall's failure. In April 2006 Castle Village solicited bids for the performance of the work required by the City. After receiving a request for clarification as to the work needed to be done, the City advised, by letter dated June 5, 2006, that it required plaintiff, inter alia, to repair and stabilize the collapsed wall, which work was to include rebuilding the collapsed portion of the wall, stabilizing and/or regrading the remaining portion of the wall and slopes, and stabilizing the surrounding soil.

During this period of time, GNY and AISLIC had been conducting settlement negotiations with the City with regard to the costs incurred by the City in responding to the emergency. In March 2006, GNY, AISLIC and the City agreed in principle that the City would accept $1,250,000 in settlement of its monetary claim against Castle Village, that GNY would contribute whatever was left of its $1 million policy limit at the time the settlement was concluded, and that AISLIC would pay the difference between $1,250,000 and the amount paid by GNY.

By letter dated October 4, 2006, AISLIC advised Castle Village that, pursuant to settlement negotiations with GNY and the City, AISLIC had preliminarily agreed to pay up to $280,000 in cleanup costs incurred by the City to "secure the area surrounding the Castle Village wall as well as the Henry Hudson Parkway." AISLIC specifically advised Castle Village, however, that its participation in the settlement "shall not operate as a waiver or estop AISLIC from asserting and/or reserving any of its rights, claims and/or defenses under the Policy or at law now or in the future." AISLIC noted that its investigation of the wall collapse was ongoing, and that it was reserving its rights to deny coverage for any claims associated with the wall collapse, including wall restoration. The letter pointedly advised that the policy did not provide coverage for property owned by the insured, and specifically referenced the "owned property" exclusion.

On December 11, 2006, Castle Village advised AISLIC that its primary coverage with GNY had been exhausted as a result of the settlement with the City, and, inter alia, demanded coverage

for the restoration work to the wall as required by the City. By letter dated March 12, 2007, AISLIC acknowledged its responsibility to pay for, or at least assume the defense of, certain third-party claims, but denied coverage for permanent wall restoration work.

Castle Village had commenced this action in 2005. To the extent relevant to this appeal, one cause of action is asserted against AISLIC, and seeks a declaration that AISLIC was obligated to defend and indemnify Castle Village against claims arising from the collapse of the wall.

On May 8, 2007 AISLIC moved for summary judgment declaring that no coverage existed for the cost of repair work to Castle Village's wall. In moving, AISLIC acknowledged that it was prepared to defend Castle Village in the third-party actions, but took the position that the "owned property" exclusion absolved it from any liability for repair to the wall itself. Castle Village cross-moved for a declaration in its favor, arguing that, by virtue of the City's directives, it had become legally obligated to perform the remediation work required by the City. It reasoned that the "owned property" exclusion became inapplicable when the City's property was damaged and the City required Castle Village to perform remediation work so that no further damage could occur. Castle Village also claimed that AISLIC did not take a coverage position until it reserved its rights on October 4, 2006, and it did not deny coverage for the remediation work until March 12, 2007, well after the settlement terms had been agreed upon, and long after Castle Village had commenced the remediation work the City required it to perform.

The motion court declared in AISLIC's favor, noting that the policy specifically excludes costs for restoration or repair of the insured's property for any reason, including prevention of injury to person or damage to property of another. The court also held that AISLIC's alleged delay in disclaiming coverage was inapplicable because AISLIC was the excess carrier, and had no duty until the primary coverage was exhausted. Moreover, AISLIC had reserved its rights under the policy exclusion in a letter dated October 4, 2006, before the primary coverage was exhausted.

A motion to reargue and renew was denied on July 7, 2008.

On appeal Castle Village asserts that, as a result of the emergency declaration, it was legally obligated to comply with the City's demand and perform the remediation work at issue, including repair of its own property. It reasons that since the

policy affords coverage for sums the insured is obligated to pay as a result of liability imposed by law, the effect of the emergency declaration was to render inapplicable the "owned property" exclusion, since the emergency declaration required it to repair the wall.

There are, of course, circumstances where an "owned property" exclusion may not be enforceable because of a legal obligation to prevent damage to another's property. In *State of New York v New York Cent. Mut. Fire Ins. Co.* (147 AD2d 77 [1989]), the property owner suffered an oil spill from a leak in a fuel line. The State sued the owner's insurer directly to recover the costs of the cleanup, and the insurer argued that the "owned property" exclusion in the policy precluded any liability on its part, since the oil had not migrated to anybody else's property. The Court noted that the oil had entered groundwater, which was not the insured's property, but instead was property entrusted to the State by its citizens. Thus, it reasoned, damage had occurred to property belonging to someone other than the insured. Effecting the cleanup of the insured's property was necessary to protect the groundwater.

Likewise, in *Don Clark, Inc. v United States Fid. & Guar. Co.* (145 Misc 2d 218 [Sup Ct, Onondaga County 1989]), an oil spill on the owner's property was found to endanger groundwater as a result of seepage, and the State directed a cleanup pursuant to its responsibilities under article 12 of the Navigation Law. The court rejected the insurer's claim that it could rely on the "owned property" exclusion in its policy, even though the cleanup was on the insured property, since the creek into which the oil spilled was not property owned by the insured (*id.* at 220). A similar result was reached by the Second Circuit in *Gerrish Corp. v Universal Underwriters Ins. Co.* (947 F2d 1023 [2d Cir 1991], *cert denied* 504 US 973 [1992]).

Central to these cases, and most of those cited by plaintiff, is that there was seepage on the insured's property, usually from an oil spill. The spills also presented a condition hazardous to the property of others, and were not capable of being remedied without the performance of cleanup measures on the insured's property. Furthermore, the conditions were ongoing, and damage was continuing.

By contrast, in this case, after the initial wall collapse and remedial measures, the hazardous condition was significantly mitigated. The possibility of a future collapse presented the need for permanent ameliorative measures, but, unlike those

situations involving an oil spill, an imminent, continuing danger no longer existed.

In *R & D Maidman Family L.P. v Scottsdale Ins. Co.* (4 Misc 3d 728 [Sup Ct, NY County 2004]), upon which Castle Village places a great deal of reliance, a situation more analogous to this case was presented. There plaintiffs had begun demolition on property they owned. After a brick or piece of masonry was dislodged and fell onto an adjoining roof, the New York City Department of Buildings issued notices of violation. In order to cure the condition, the plaintiffs erected a sidewalk bridge, scaffolding and net meshing, and then filed a claim with their insurer to recover the costs expended on their property to mitigate or prevent future damage. Finding that the notices of violation did not give rise to a legal obligation to bear the costs for remedial work that would trigger the indemnification provisions of the commercial general liability policy issued to the plaintiffs, the court initially awarded the defendant insurer summary judgment. The court, however, subsequently reversed itself, in an unreported decision (2004 NY Slip Op 30309[U]), and denied the insurer summary judgment, because it concluded that there were issues of fact as to whether the notices of violation were issued because of damage to adjacent property. The court indicated that if such were the case, coverage would attach.

We observe that we are obviously not bound by the Supreme Court's determination in *R & D Maidman*, but, in any event, we do not agree with the court's rationale that the test as to whether the exclusion should be avoided is whether a legal directive had been issued. The answer to that question is only helpful in ascertaining whether coverage is triggered. If coverage were the only issue, and there were no "owned property" exclusion, Castle Village's damages, including its obligation to repair the wall, would have been covered.

The issue is not coverage, but, rather, the applicability of the exclusion. In determining whether the exclusion applies, the question becomes not whether the City ordered Castle Village to repair its own wall, but, rather, whether repair of the wall was necessary to stop ongoing and imminent damage to property belonging to another, such as in those cases where the threat of oil pollution was continuing.

Here, however, since the emergency work had been completed, the directive to perform repair work was necessary to safeguard against future incidents, and not immediate, recurring harm. Castle Village had an obligation to repair the wall,

but it was not an obligation that AISLIC was required to indemnify. Even if there had never been a collapse, the City could have directed repair of the wall, and the "owned property" exclusion would have absolved AISLIC of the obligation to reimburse Castle Village.

Thus, the test for determining whether the exclusion applies must focus on the nexus between the condition of the insured's property and the existence of ongoing and immediate harm to the property of others. Where the harm cannot be cured without performing work on the insured's property, the exclusion is not applicable. On the other hand, in cases like this, where the immediate danger has been corrected, the restorative work to the insured's property will not be covered.

Contrary to plaintiff's contentions, we do not find the language of the exclusion ambiguous. Plaintiff avers that there are two valid interpretations of the "owned property" exclusion. The first is AISLIC's position that it has no obligation under any circumstances, while the second, plaintiff's, is that the exclusion is only applicable when there has been no damage to the property of a third party. We do not construe AISLIC's interpretation to be inconsistent with those cases involving an oil spill, where the insurer was obligated to pay for work necessary to remediate an ongoing situation. Further, we do not find plaintiff's interpretation, that the exclusion will be applicable only when there is no third-party damage, to be reasonable. As discussed above, the question of the applicability of the exclusion turns on the nature of the damage, and the nexus of the insured's property to any recurring damage. Thus, there is no need to resort to the general principle that ambiguities should be construed against the insurer drafter (*see e.g. Westview Assoc. v Guaranty Natl. Ins.* Co., 95 NY2d 334, 339 [2000]; *see also Bovis Lend Lease LMB, Inc. v Royal Surplus Lines Ins. Co.*, 27 AD3d 84, 94 [2005]). The policy provides coverage for damage to the property of another, and not for the property of the insured. If there is an overlap, work on the insured's property which is necessary to cure (as opposed to prevent) imminent and recurring damage to adjoining property falls outside the exclusion.

Castle Village also argues that AISLIC should be estopped from asserting the "owned property" exclusion because it allegedly delayed in disclaiming coverage, and its participation in the settlement of the City's monetary claim somehow led Castle Village to rely on those negotiations to its detriment.

■ First, AISLIC's policy provides that it applies "only in excess of the total applicable limits of Scheduled Underlying Insurance." Thus, its obligations were not even triggered until December 2006, when Castle Village notified AISLIC that its primary policy had been exhausted, but this came two months after Castle Village had been put on notice by AISLIC's October 4, 2006 reservation of rights letter that the "owned property" exclusion was applicable to any property owned by Castle Village. As an excess insurer, AISLIC did not have any duty to act until primary coverage was exhausted by payment (*see Wilson v Galicia Contr. & Restoration Corp.*, 36 AD3d 695, 697 [2007], *affd* 10 NY3d 827 [2008]).

Although a reservation of rights letter by itself has no relevance to the question of timely notice of disclaimer (*see Hartford Ins. Co. v County of Nassau*, 46 NY2d 1028, 1029 [1979]), the October 4 letter specifically advised that coverage was excluded for owned property, and effectively conveyed a coverage position which put Castle Village on notice that the costs of restoration would not be covered.

Finally, there has been no showing that Castle Village, which obviously, and ultimately, needed to repair its wall, was somehow beguiled by AISLIC into believing that AISLIC was going to pay for the restoration. We thus conclude that the plain language of the exclusion supports the conclusion that, in the circumstances presented, Castle Village's cost of restoring the wall was not to be borne by AISLIC.

Accordingly, the order of the Supreme Court, New York County (Helen E. Freedman, J.), entered February 5, 2008, which granted summary judgment to defendant American International Specialty Lines Insurance and declared that the insurer does not have to reimburse plaintiff Castle Village Owners Corp. for the reconstruction of the wall, and the order of the same court and Justice, entered July 8, 2008, which denied plaintiff's motion to renew, should be affirmed, with one bill of costs.

SAXE, J.P., FRIEDMAN, SWEENY and DEGRASSE, JJ. concur.

Order, Supreme Court, New York County, entered February 5, 2008, and order, same court, entered July 8, 2008, affirmed, with one bill of costs.