ROBERT PITMAN, UNITED STATES DISTRICT JUDGE
Before the Court is Defendant Evanston Insurance Company's ("Evantson") Motion for Summary Judgment. (Dkt. 66). Also before the Court is Evanston's Objections and Motion to Strike Evidence in Support of Plaintiff's Response to Motion for Summary Judgment.[1] (Dkt. 92). Having considered the parties' briefs, the evidence, and the relevant law, the Court issues the following order.
I. BACKGROUND
This is an action about benefits under an insurance policy following pollution damage to commercial property. The following facts are not disputed. Plaintiff HLT Properties, LLC ("HLT") leased commercial property (the "Property") to non-party Global Environmental Services, LLC ("GES") on January 20, 2015. (Lease Agreement, Dkt. 66-4). HLT's owner, Lewis Talbert ("Talbert"), visited the property on May 21, 2015, and discovered that GES was storing and recycling televisions, computers, and lead-bearing glass tubes known as "cathode ray tubes" ("CRTs"). (Talbert Dep., Dkt. 66-11, at 6:16-7:9). Talbert found that GES was "separating the glass of computer screens, CRT Screens, and separating the lead out, lead and other chemicals out of the CRT screens from the plain, non-hazardous glass." (Id. ). On May 22, 2015, Talbert sent a notice of default to GES and threatened to evict them for handling hazardous materials at the property in violation of the lease. (Id. at 7:20-8:3). GES's operator, Kenneth Gravitt ("Gravitt"), assured Talbert that GES was not processing hazardous material on site. (Id. at 8:12-15). By May 25, Talbert was satisfied that GES cured their default after GES cleaned up the site and sent Talbert a certificate of insurance. (Id. at 8:4-19).
GES obtained its insurance policy (the "Policy") from Evanston, which issued the Policy to GES for a period from July 21, 2015 through July 21, 2016. (Ins. Policy, Dkt. 66-3). The Policy includes a commercial general liability ("CGL") coverage *724 form and an environmental impairment liability ("EIL") coverage form. (Id. at 6). The Policy also includes a choice-of-law provision specifying that New York law governs all matters arising out of or related to the Policy. (Id. at 9). Finally, the Policy contains an endorsement entitled "Additional Insured - Owners, Lessees or Contractors (Blanket) Endorsement." (Id. at 65). This endorsement expands policy coverage under the CGL coverage form to include "any person or organization to whom the insured agrees to provide Additional Insured status in a written contract signed by both parties and executed prior to the commencement of operations." (Id. ).
On October 27, 2015, GES's neighbor urged HLT to visit the Property out of concern that GES's operations were causing environmental damage to the surrounding property. (Talbert Dep., Dkt. 66-11, at 9:12-18). During that visit, Talbert discovered that GES had damaged the Property. (Id. at 9:12-18). Talbert found that "the place was totally a mess" with sand piled outside the building, broken glass everywhere, and boxes stacked inside the building. (Id. at 11:4-12:5). The interior walls of the building were "messed up," the exterior walls had several dents and holes, the garage door was broken, and the AC system was clogged from GES's operations (Id. ). This was the first time that Talbert believed GES's operations rose to the level of pollution that would justify an environmental claim under the Policy. (Talbert Dep., Dkt. 76-1, at 14:7-23).
That same day, Matt Hall, GES's contact, told HLT that GES intended to clean the Property and that it would not abandon the Property.[2] (Talbert Dep., Dkt. 66-11, at 10:18-11:7). HLT also made a claim under the Policy on October 27, 2015, asserting a claim arising from the abandonment of recycled computers which allegedly caused lead contamination. (Olear Dep., Dkt. 76-3, at 14:11-24; Denial of Claim, Dkt. 66-6, at 2). HLT also alleged physical property damage sustained to the Property as a result of GES's operations and use of the Property. (Denial of Claim, Dkt. 66-6, at 2).
Evanston denied HLT's claim. On February 2, 2016, Evanston concluded that "there is no coverage available for [HLT] under" the GES Policy. (See Denial of Claim, Dkt. 66-6, at 1). Evanston denied coverage because "[c]overage is only available for insureds" and HLT "is not a named insured under the policy." (Id. at 2). Specifically, Evanston explained that coverage is only available for insureds and that HLT was neither a named insured nor an additional insured. (Id. at 2). Evanston noted that the "Additional Insured Endorsement" required a written contract executed before operations commenced for HLT to be covered under the CGL form, but Evanston did not possess any contract between GES and HLT granting HLT additional insured status. (Id. at 3). As a result, HLT did not satisfy the requirements of the Additional Insured Endorsement. (Id. ).
Evanston also denied coverage under the terms of the Policy. First, Evanston noted that there was no coverage for the claim under the CGL form. (Id. ). Evanston explained that the policy "only affords defense and indemnity for claims against an insured seeking damages because of ... 'property damage' during the policy period and caused by an 'occurrence', defined in pertinent part as an accident." (Id. ). But based on the information Evanston received, there was no "occurrence." (Id. ). Evanston also cited several exclusions in *725 denying coverage: the total pollution exclusion, the property damage exclusion, and the lead exclusion. (Id. ). Because all of HLT's claims against GES arise out of property damage due to lead contamination or property rented by GES or owned by HLT, Evanston found that there was no coverage under the CGL form. (Id. ).
Next, Evanston denied coverage under the EIL coverage form. (Id. at 3-4). Evanston noted that the Policy included coverage for "Sudden and Abrupt Discharge, Release or Escape of Pollutants" for HLT's property. (Id. ). Evanston found that the alleged lead contamination and physical property damage arising from GES's work as an electronics recycler was not considered a "sudden and abrupt 'pollution condition' " under the Policy. (Id. at 4). And Evanston further reasoned that there was no verification that a "pollution condition" existed at the Property. (Id. ). Finally, Evanston found that the Property Damage Exclusion precluded coverage for damages arising from property owned, leased or operated by GES. (Id. ).
On November 20, 2015, the Texas Commission on Environmental Quality ("TCEQ") inspected the Property. (TCEQ Inv. Rep., Dkt. 66-12). The TCEQ found that the outdoor sand piles contained hazardous levels of lead as a result of GES's improper storage and disassembly of recycled CRTs. (Id. at 2-3, 6). The TCEQ also found that GES's operations were in violation of state environmental protection laws and demanded immediate remediation. (Id. at 2, 4, 6-7).
HLT complied and sought to recover its remediation costs from GES. (See Dkt. 66-13, at 2-3). The bankruptcy court granted HLT relief from the automatic stay GES's bankruptcy action in order to "contact and assert a claim and receive payment from [GES's] insurance company relating to any covered loss as defined in any applicable insurance policy to the extent of any applicable insurance coverage." (Bankr. Order, Dkt. 66-5, at 2). Accordingly, HLT filed this action in state court against several insurer and insurance agent defendants, including Evanston, in addition to GES and Gravitt on February 17, 2017. (Orig. Pet., Dkt. 1-1, at 55). HLT obtained a default judgment against GES for property damage and cleanup costs. (Def. J., Dkt. 66-7). The state court ordered GES to pay $538,429.36 in damages plus attorney's fees, costs, and pre-and post-judgment interest. (Id. ). Defendant Risk Placement Services, Inc. ("RPS") later removed the suit to this Court. (Not. Rem., Dkt. 1).
Evanston is the only remaining defendant in this action. The other defendants have all filed notices of settlement or stipulations of dismissal. (See RPS Stip., Dkt. 37; MSI Stip., Dkt. 87; AssuredPartners Joint Mot. Dismiss, Dkt. 88; Travelers Not., Dkt. 94). In its amended complaint, (Dkt. 54), HLT states claims against Evanston for breach of the insurance policy, breach of common law duty of good faith and fair dealing, and violations of the Texas Insurance Code. (See Am Compl., Dkt. 54, at 7-8, 10). HLT alleges that a valid contract existed between GES and Evanston and that Evanston materially breached the insurance contract by denying coverage and refusing to investigate and timely pay HLT's claims. (Id. at 7). HLT also alleges that Evanston is liable under the Texas Insurance Code for failing to effectuate a prompt settlement of HLT's claim after liability was reasonably clear. (Id. at 8). Finally, HLT alleges that Evanston breached the duty of good faith and fair dealing by denying payment of HLT's claim without a reasonable basis. (Id. at 10). Evanston seeks summary judgment on HLT's claims. (Dkt. 66).
II. LEGAL STANDARD
Summary judgment is appropriate when there is no genuine dispute as to *726 any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) ; Celotex Corp. v. Catrett , 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." Sossamon v. Lone Star State of Tex. , 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson , 477 U.S. at 255, 106 S.Ct. 2505. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. Matsushita Elec. Indus. Co. v. Zenith Radio , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the movant bears the ultimate burden of proof, she must establish all the essential elements of her claim that warrant judgment in her favor. See Chaplin v. NationsCredit Corp. , 307 F.3d 368, 372 (5th Cir. 2002). Once the movant does so, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. Austin v. Kroger Texas, L.P. , 864 F.3d 326, 335 (5th Cir. 2017). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. Turner v. Baylor Richardson Med. Ctr. , 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. Adams v. Travelers Indem. Co. of Conn. , 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. Id. After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. Miss. River Basin Alliance v. Westphal , 230 F.3d 170, 175 (5th Cir. 2000). Because this case comes before the Court on the basis of diversity jurisdiction, the Court applies state substantive law. 28 U.S.C. § 1332 ; Westerman v. Sears, Roebuck & Co. , 577 F.2d 873, 879 (5th Cir. 1978) (citing Erie R.R. Co. v. Tompkins , 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ).
III. DISCUSSION
A. Evidentiary Objections
As an initial matter, Evanston objects to and moves the Court to strike several exhibits included in HLT's Response to Defendant's Motion for Summary Judgment. (See Mot. Strike, Dkt. 92; Resp. Mot. Summ. J., Dkt. 76). Specifically, Evanston asks the Court to strike the unsworn affidavit of Lewis Talbert, (Talbert Decl., Dkt. 76-2), because it is conclusory, speculative, and self-serving; it contains hearsay statements; it is based on conclusions of law; and Talbert is not qualified to render legal opinions and his opinions are not reliable, *727 (Mot. Strike, Dkt. 92, at 1-2). Evanston also moves to strike three sub-exhibits to Talbert's declaration because they contain hearsay and they have not been authenticated. (Id. at 2). Because the Court does not rely on this evidence in analyzing Evanston's motion for summary judgment, the objection need not be resolved.
B. Standing
Evanston argues that it owes no obligation to pay HLT benefits under the insurance policy issued to GES because HLT is neither a named insured nor an additional insured under the Policy. (Mot. Summ. J., Dkt. 66, at 5-6). Because Evanston questions whether HLT has standing to pursue its claims, the Court considers this argument first. See Raines v. Byrd , 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).
Under the Additional Insured Endorsement, an additional insured is "[a]ny person(s) or organization(s) to whom the insured agrees to provide Additional Insured status in a written contract signed by both parties and executed prior to the commencement of operations." (Ins. Policy, Dkt. 66-3, at 65). The Policy provides for limited additional insured CGL coverage for GES's operations on behalf of the purported additional insured. (See Dkt. 66-3, at 65). Coverage includes only liability for "bodily injury," "property damage," or "personal and advertising injury" incurred in the performance of GES's ongoing operations for the additional insured that are caused by (1) GES's acts or omissions or (2) the acts or omissions of those acting on GES's behalf. (Id. ).
HLT does not dispute that it is not a named insured under the Policy. (See Ins. Policy, Dkt. 66-3, at 6 (providing that GES is the named insured)). Instead, HLT argues that it has standing to sue Evanston as a third-party beneficiary judgment creditor.[3] (Resp. Mot. Summ. J., Dkt. 76, at 4 & n.19). Evanston concedes that HLT is entitled to recover under the Policy as a judgment creditor of GES. (See Mot. Summ. J., Dkt. 66, at 7 & n.32; see also Final Def. J., Dkt. 66-7). As a judgment creditor, HLT stands in the same position as GES with respect to Evanston, and HLT's recovery under the Policy is limited to the coverage the Policy affords to GES. See Spadaro v. Newark Ins. Co. , 21 A.D.2d 226, 249 N.Y.S.2d 753, 757 (1964), affirmed , 15 N.Y.2d 1000, 260 N.Y.S.2d 16, 207 N.E.2d 611 (1965) ; Gap, Inc. v. Fireman's Fund Ins. Co. , 11 A.D.3d 108, 782 N.Y.S.2d 242, 244 (2004). Accordingly, HLT has standing to recover under the insurance policy as a third-party judgment creditor of GES.
But HLT lacks standing as a judgment creditor to assert causes of action under the Texas Insurance Code and *728 for the breach of duty of good faith and fair dealing. Under Texas law, third parties lack standing to sue insurers for unfair claim settlement practices and violating the prompt payment requirements under the Texas Insurance Code. See Travelers Lloyds Ins. Co. v. Cruz Contracting of Tex., LLC , No. 5:16-CV-759-DAE, 2017 WL 5202890, at *4 (W.D. Tex. Mar. 17, 2017) (citing cases); Mokhtar v. Penn-Am. Ins. Co. , No. 3:16-CV-1168-O, 2016 WL 9527963, at *3 (N.D. Tex. June 22, 2016) ("Courts applying Texas law have consistently determined that a party who is not a named insured, additional insured, or third-party beneficiary has no standing to sue for failure to pay insurance benefits."). As the Texas Supreme Court has explained, "allowing third-party claimants standing to sue an insurer for unfair claims settlement practices would directly conflict with the well-established duties insurers owe their insureds." Crown Life Ins. Co. v. Casteel , 22 S.W.3d 378, 384 (Tex. 2000) (citing Allstate Ins. Co. v. Watson , 876 S.W.2d 145, 147 (Tex. 1994) ). Thus, "where the injured party is not party to the insurance policy, there is a long standing prohibition against allowing the injured party to sue the insurance company." Lasewicz v. Joyce Van Lines, Inc. , 830 F. Supp. 2d 286, 292 (S.D. Tex. 2011) (citing Lyons v. Ayala , 723 S.W.2d 254, 257 (Tex. App.-Fort Worth 1986, no writ) ).
Here, HLT explicitly represents that it has standing as a third-party judgment creditor rather than an additional insured, and HLT has not shown how GES's obligations under the lease agreement are sufficient to establish its status as an additional insured under the terms of the Policy. See Admiral Ins. Co. v. Joy Contractors, Inc. , 81 A.D.3d 521, 917 N.Y.S.2d 168, 170 (2011) (distinguishing between a lessor-lessee relationship and performing ongoing operations for an additional insured). Texas law is clear that third-party claimants lack standing to assert direct claims against an insurance company under the Texas Insurance Code for unfair settlement practices or violating the prompt-payment requirement. See, e.g. , Caplinger v. Allstate Ins. Co. , 140 S.W.3d 927, 931 (Tex. App.-Dallas 2004, pet. denied) (noting that third-party claimant lacked standing to sue insurance company directly for unfair or deceptive acts or practices under the Texas Insurance Code); Whatley v. City of Dall. , 758 S.W.2d 301, 307 (Tex. App.-Dallas 1988, writ denied) (finding that third-party claimant lacked standing to assert a negligent failure to settle insurance claim under the Texas Insurance Code). Evanston is thus entitled to summary judgment on HLT's claims alleging violations of the Texas Insurance Code.
The same is true for HLT's claims alleging a breach of the duty of good faith and fair dealing. (See Am. Compl., Dkt. 54, at 10). The Supreme Court of Texas expressly stated that it has recognized the bad-faith claim only in the first-party context, where an insured seeks recovery for the insured's own loss. Universe Life Ins. Co. v. Giles , 950 S.W.2d 48, 53 n.2 (Tex. 1997). Texas law does not recognize a common law duty of good faith and fair dealing in third-party claims; the Texas Supreme Court has "declined to extend the bad-faith cause of action to the third-party context, in which an insured seeks coverage for injuries to a third party." Id. (citing Md. Ins. Co. v. Head Indus. Coatings & Servs., Inc. , 938 S.W.2d 27, 28 (Tex. 1996) (per curiam)). Here, HLT is a third party under the policy and thus is precluded from bringing a claim for breach of the duty of good faith and fair dealing against Evanston.
*729 HLT thus lacks standing under Texas law to pursue its statutory and common law bad-faith claims against Evanston under Chapters 541 and 542 of the Texas Insurance Code and the duty of good faith and fair dealing. See Travelers Lloyds Ins. Co. , 2017 WL 5202890, at *5. The Court will analyze whether HLT is entitled to benefits under the CGL or EIL coverage forms of the Policy as a third-party judgment creditor.
C. Breach of Contract
HLT alleges that a valid contract existed between GES and Evanston, and that Evanston materially breached the contract by denying coverage and refusing to investigate and timely pay HLT's claims. (Am. Compl., Dkt. 54, at 7). Evanston argues that the policy does not cover HLT's damages as a matter of law because HLT's claims do not fall within the scope of either the CGL or EIL coverage forms. (Mot. Summ. J., Dkt. 66, at 5). Even if they did, Evanston argues, HLT's damages are precluded by multiple policy exclusions. (Id. ).
Under New York law, "[i]nsurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co. , 650 F. App'x 70, 71 (2d Cir. 2016) (quoting In re Estates of Covert , 97 N.Y.2d 68, 735 N.Y.S.2d 879, 761 N.E.2d 571, 576 (2001) ). When deciding a coverage dispute, courts "first look to the language of the policy." Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh , 21 N.Y.3d 139, 969 N.Y.S.2d 808, 991 N.E.2d 666, 671 (2013) (quoting Consol. Edison Co. of N.Y. v. Allstate Ins. Co. , 98 N.Y.2d 208, 746 N.Y.S.2d 622, 774 N.E.2d 687, 693 (2002) ). If the language is unambiguous, the Court must interpret the policy provisions in light of their "plain and ordinary meaning." Lantheus Med. Imaging, Inc. , 650 F. App'x at 71 (quoting 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co. , 634 F.3d 112, 119 (2d Cir. 2011) ). In doing so, courts "construe the policy in a way that 'affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.' " Roman Catholic Diocese of Brooklyn , 969 N.Y.S.2d 808, 991 N.E.2d at 671-72 (quoting Consol. Edison Co. of N.Y. , 746 N.Y.S.2d 622, 774 N.E.2d at 693 ).
"Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly." Palmieri v. Allstate Ins. Co. , 445 F.3d 179, 187 (2d Cir. 2006) (quoting Thompson v. Gjivoje , 896 F.2d 716, 721 (2d Cir. 1990) ). If a provision is ambiguous, the court interprets the language in the context of its "purpose and effect" in the policy and "the apparent intent of the parties." Accessories Biz, Inc. v. Linda and Jay Keane, Inc. , 533 F. Supp. 2d 381, 386 (S.D.N.Y. 2008) (quoting Murray Oil Prods. v. Royal Exch. Assurance Co. , 21 N.Y.2d 440, 288 N.Y.S.2d 618, 235 N.E.2d 762, 764 (1968) )). Where a term in an insurance policy is not defined, it is appropriate to define the term as it ordinarily would be understood by laypersons. Id. The court must resolve any remaining ambiguity in favor of the insured. Id.
HLT, as the insured, bears the initial burden to show that coverage exists under the policy. Consol. Edison Co. of N.Y. , 746 N.Y.S.2d 622, 774 N.E.2d at 690. Once coverage is established, the insurer bears the burden to show that an exclusion applies. Id. New York "law governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds," and exclusions are given a strict and narrow construction.
*730 Pioneer Tower Owners Assn. v. State Farm Fire & Cas. Co. , 12 N.Y.3d 302, 880 N.Y.S.2d 885, 908 N.E.2d 875, 876-77 (2009). The insurer can meet is burden by establishing that "the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." Lantheus Med. Imaging , 650 F. App'x at 71 (quoting Vill. of Sylvan Beach v. Travelers Indem. Co. , 55 F.3d 114, 115-16 (2d Cir. 1995) ).
1. CGL coverage form
Evanston argues that HLT's damages do not implicate the grant of coverage under the Commercial General Liability ("CGL") coverage form. (Mot. Summ. J., Dkt. 66, at 8). The CGL form begins with a general description of coverage: the Policy provides coverage for "property damage" that is caused by an "occurrence." (Ins. Policy, Dkt. 66-3, at 40 ¶ 1.b). An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 51, ¶ 13).
Evanston says that the CGL form is not implicated because the damages are not property damage caused by an "occurrence" under the terms of the Policy. (Mot. Summ. J., Dkt. 66, at 8). HLT argues that the property damage was the result of a "sudden event" that occurred sometime between October 21 and October 27, 2015. (See Resp. Mot. Summ. J., Dkt. 76, at 5). Accordingly, to be entitled to coverage under the Policy, HLT must show that its damages are covered by the CGL form if they were the result of an "accident."
The Policy does not define the term "accident." Courts applying New York law, however, acknowledge that "[t]he term 'accident has well-settled meaning in New York insurance law." Met. Prop. & Cas. Ins. Co. v. Sarris , No. 1:15-CV-0780 (LEK/DJS), 2017 WL 3252812, at *7 (N.D.N.Y. July 28, 2017). The New York Court of Appeals defined the term "accident" as an "unexpected, unusual and unforeseen" event from the insured's perspective. State Farm Mut. Auto. Ins. Co. v. Langan , 16 N.Y.3d 349, 922 N.Y.S.2d 233, 947 N.E.2d 124, 127 (2011) ; see also Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd. , 882 F.3d 952, 960 (10th Cir. 2018) (quoting Cont'l Cas. Co. v. Rapid-Am. Corp. , 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 510 (1993) ) ("The New York Court of Appeals has held that damages are accidental so long as they are 'unexpected and unintentional.' "). New York courts construe "expected or intended" coverage terms "narrowly, barring recovery only when the insured intended the damages." Cont'l Cas. Co. , 593 N.Y.S.2d 966, 609 N.E.2d at 510 ; see also Olin Corp. v. Lamorak Ins. Co. , 332 F. Supp. 3d 818, 844 (S.D.N.Y. 2018). Additionally, "[i]t is well settled that an injury may be accidental even though it results from an intentional act." Dodge v. Legion Ins. Co. , 102 F. Supp. 2d 144, 151 (S.D.N.Y. 2000) (citing Cont'l Cas. Co. , 593 N.Y.S.2d 966, 609 N.E.2d at 510 ). A policyholder might take a "calculated risk" without expecting or intending the resulting damages. Cont'l Cas. Co. , 593 N.Y.S.2d 966, 609 N.E.2d at 510. "[I]n fact, people often seek insurance for just such circumstances." Id.
On the other hand, New York courts also recognize that there are some acts where the alleged harm is an inherent result of the intentional act itself. See Progressive N. Ins. Co. v. Rafferty , 17 A.D.3d 888, 793 N.Y.S.2d 618, 619 (2005) (citing Allstate Ins. Co. v. Mugavero , 79 N.Y.2d 153, 581 N.Y.S.2d 142, 589 N.E.2d 365, 369-70 1992 (1992) ). Harm is " 'inherent in the nature' of an act when the act is so exceptional that 'cause and effect cannot be separated; that to do the act is necessarily to do the harm which is its consequence; and that since unquestionably the *731 act is intended, so also is the harm.' " Id. at 619-20 (quoting Mugavero , 581 N.Y.S.2d 142, 589 N.E.2d at 369 ).
Evanston argues that GES's "ongoing recycling operations, including its intentional act of using an uncommon separation method that contaminated the final product with lead, are the actual harm," (Reply Mot. Summ. J., Dkt. 91, at 4), and that HLT's damages were the inherent result of GES's regular and intentional business operations in recycling glass CRTs from electronics. (Mot. Summ. J., Dkt. 66, at 8). Thus, according to Evanston, HLT's damages were not the result of an "accident" under the CGL coverage form because GES could anticipate that HLT would suffer damages from its separation method. (Id. at 8 & n.36). HLT, however, disputes that its damages were the inherent result of GES's acts; it says that GES's regular business operations involved separating the leaded glass for disposal offsite, and GES did not intend for the damages to occur. (Resp. Mot. Summ. J., Dkt. 76, at 4-5 (quoting Cont'l Cas. Co. , 593 N.Y.S.2d 966, 609 N.E.2d at 510 )).
There is at least a genuine dispute of material fact regarding whether HLT's damages were "accidental," even if GES expected the damages that occurred. Talbert testified that GES stored and recycled televisions, computers, and lead-bearing glass tubes as part of its operations. (Talbert Dep., Dkt. 66-11, at 7:3-12). HLT argues that it realized that GES was "actually separating the glass of computer screens, CRT screens, and separating the ... lead and other chemicals out of the CRT screens from the plain, non-hazardous glass" in May. (Id. at 7:3-9). At that point, Talbert sent a notice of default, but he did not believe that GES was mishandling hazardous materials. (See Resp. Mot. Summ. J., Dkt. 76, at 5-6; Talbert Dep., Dkt. 76-1, at 10:9-21, 11:20-12:12, 14:17-23, 18:11-24). GES told HLT that it was not processing hazardous materials, just separating them for disposal offsite. (Resp. Mot. Dismiss, Dkt. 76, at 5-6; see also Talbert Dep., Dkt. 76-1, at 13:12-15).
GES was in the business of recycling electronics, and thus potentially handling hazardous materials, but that alone does not show that HLT's damages were the inherent result of GES's acts. See City of Johnstown N.Y. v. Bankers Standard Ins. Co. , 877 F.2d 1146, 1147 (2d Cir. 1989) ("[T]he record suggests that the City was aware of potential contamination, but not that the City intended the resulting damage, nor that the City, intending harm, knew that the extensive damages alleged ... would flow directly and immediately from the City's intentional acts."). Properly performed, GES's business operations would not have damaged HLT's property. Thus, the cause and effect of GES's actions can be separated, and Evanston has failed to show that the damages to the property were intentional rather than the result of some accident. Given that courts construe "expected or intended" provisions narrowly, and drawing all inferences in HLT's favor, there is a dispute as to whether GES intended the damage to HLT's property or knew that the damages alleged would flow from its intentional acts.
But that is not the end of the coverage analysis. Evanston next argues that four exclusions preclude coverage for HLT's damages as a matter of law: the total pollution exclusion, the damage-to-property exclusion, and the lead and silica exclusions. (Mot. Summ. J., Dkt. 66, at 8).
a. Total Pollution Exclusion
The total pollution exclusion precludes coverage for "property damage" "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants."
*732 (Ins. Policy, Dkt. 66-3, at 60 ¶ (f)(1)). Coverage is excluded for "[a]ny loss, cost, or expense arising out of any ... [r]equest, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, ... or in any way respond to ... 'pollutants.' "[4] (Id. at 60 ¶ (f)(2); see also id. at 41 ¶ (f)).
Evanston argues that the total pollution exclusion precludes coverage under the CGL form. (Mot. Summ. J., Dkt. 66, at 9). According to Evanston, the exclusion was intended to preclude coverage for government-mandated cleanup. (Id. at 9 & n.39). And HLT acknowledges its damages were incurred under TCEQ supervision to prevent environmental contamination and contain hazardous waste. (Id. at 10; see also Pl.'s Objs., Ans., & Resps. to Def.'s Interrogs., RFA's, & RFP's, Dkt. 66-17, at 8-9 (admitting that "HLT repaired physical damage to the property, removed and disposed of certain hazardous waste at the request of the TCEQ, removed and disposed of additional materials, and incurred additional costs as described herein in response to interrogatory requests")).
HLT appears to concede that the costs it incurred by cleaning up the lead-containing sand piles are excluded under the total pollution exclusion. (See Resp. Mot. Summ. J., Dkt. 76, at 6; Pl.'s Objs., Ans., & Resps. to Def.'s Interrogs., RFA's, & RFP's, Dkt. 66-17, at 4-5 (noting that lead in the crushed glass was stored outdoors and seeped into the soil)). HLT, however, argues that not all its damages were a result of cleaning up lead at the property; the TCEQ only tested and required clean-up of the outdoor sand piles.[5] (Resp. Mot. Summ. J., Dkt. 76, at 6; see also Pl.'s Objs., Ans., & Resps. to Def.'s Interrogs., RFA's, & RFP's, Dkt. 66-17, at 9 ("HLT incurred additional costs unrelated to the sand piles.")). Talbert testified that, beyond the lead-containing sand piles, "[t]here was physical damage to the building, it was filled with trash that had to be disposed of." (Talbert Dep., Dkt. 76-1, at 22:4-9). And "the drive was covered with broken glass pieces in the gravel everywhere ... [t]he interior walls of the building were messed up ... [t]he exterior walls had several dents and holes in them. A broken garage door. The AC system was all gummed up with dust from their operation." (Id. at 23:5-16).
HLT's costs incurred by cleaning up the lead-containing sand piles are excluded by the total pollution exclusion under the CGL form. It is not disputed that TCEQ demanded HLT clean up and remove pollutants at the Property. (Mot. Summ. J., Dkt. 66, at 10; Am. Compl., Dkt. 54, at 6 ¶ 20; Pl.'s Objs., Ans., & Resps. to Def.'s Interrogs., Dkt. 66-17, at 8-9 (admitting that HLT removed and disposed of hazardous waste at the request of TCEQ)). This falls squarely within the total pollution exclusion. While the total pollution exclusion precludes HLT's recovery for costs incurred as a result of the TCEQ-directed clean up, Evanston has not shown that the remaining damages to the Property were the result of the discharge, dispersal, *733 seepage, migration, release or escape of pollutants.
b. Damage to Property Exclusion
The CGL's damage to property exclusion precludes coverage for property damage to "[p]roperty [GES] own[s], rent[s], or occup[ies], including any costs or expenses incurred by [GES], or any other person ... for repair, replacement, enhancement, restoration or maintenance of such property for any reason." (Ins. Policy, Dkt. 66-3, at 43, ¶ 2.j). "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (Id. at 51 ¶ 17). Under New York law, standard CGL policies do not cover damage to insured's own property; courts routinely hold that damage-to-property exclusions preclude coverage for property damage to property rented or occupied by the insured. See, e.g. , Castle Vill. Owners Corp. v. Greater N.Y. Mut. Ins. Co. , 64 A.D.3d 44, 878 N.Y.S.2d 311, 316 (2009) ; Utica Mut. Ins. Co. v. Watertown Indus. Ctr. Local Dev. Corp. , 9 A.D.3d 836, 781 N.Y.S.2d 392, 393 (2004).
There are, however, circumstances where a damage-to-property exclusion is not enforceable. Courts in the Second Circuit have found that the exclusion does not apply where cleanup of the insured's property is required to remedy or prevent damage to a third party's property or protect public health. Olin Corp. , 332 F. Supp. 3d at 843-44 (citing cases). This is true regardless of whether damage to a third party has actually occurred. Id. ; Kirchner v. Fireman's Fund Ins. Co. , No. 90 Civ. 5367 (KC), 1991 WL 177251, at *8 (S.D.N.Y. Sept. 4, 1991). A damage-to-property exclusion thus may not be enforceable under New York law if there is a legal obligation to prevent imminent damage to another's property. See Castle Vill. Owners Corp. , 878 N.Y.S.2d at 315. Courts adopted this rule in order to incentivize swift cleanup and stop pollution as soon as possible. Savoy Med. Supply Co., Inc. v. F & H Mfg. Corp. , 776 F. Supp. 703, 708 (E.D.N.Y. 1991).
Evanston argues that HLT seeks recovery for damage to property that GES rented from it, which is plainly excluded by the Damage to Property Exclusion. (Mot. Summ. J., Dkt. 66, at 10-11). HLT, on the other hand, argues that the Damage to Property Exclusion does not apply where the cleanup of an insured's property is required for public health reasons or to prevent damage to a third party. (Resp. Mot. Summ. J., Dkt. 76, at 7).
Here, the damage-to-property exclusion precludes recovery for HLT's remaining damages claims. There is no dispute that the property damage at issue in this suit concerns property leased by GES. (See Lease, Dkt. 66-4, at 2; Pl.'s Objs., Ans., & Resps. to Def.'s Interrogs., Dkt. 66-17, at 8 (admitting that the property damage was to property leased and occupied by GES)). HLT argues that the exclusion does not apply because the sand pile posed an "imminent threat of pollution to public waters and land." (Resp. Mot. Summ. J., Dkt. 76, at 8 (quoting TCEQ Inv. Rep., Dkt. 66-12, at 5-6)). But, as already stated, costs HLT incurred in cleaning up the sand is precluded under the total pollution exclusion. HLT does not explain how remediating the remaining damage to the property was required to prevent damage to a third party or protect public health. The Policy expressly excludes property damage to property owned, rented, or occupied by GES. (Ins. Policy, Dkt. 66-3, at 43, ¶ (2)(j)). As a result, all of HLT's CGL claims are either precluded from recovery under either the total pollution exclusion or the *734 damage-to-property exclusion.[6]
2. EIL coverage form
Evanston also argues that HLT's damages do not implicate the EIL coverage form. (Mot. Summ. J., Dkt. 66, at 12). The EIL covers property damage and cleanup costs "resulting from a sudden and abrupt covered 'pollution condition' at, on, under, or migrating from" the property. (Ins. Policy, Dkt. 66-3, at 74 ¶ (12)). A "pollution condition" is "the discharge, dispersal, seepage, migration, release or escape of 'pollutants.' "[7] (Id. at 87, ¶ (NN)). In order to be covered, the pollution condition must commence during the policy period, the insured must report the pollution condition to the insurer in writing within 21 business days following its discovery, and a claim must be made within seven days from the day and time that the pollutants are first discovered. (Id. at 74, ¶ (12)(c), (e), (g)).
Evanston argues that HLT's claims are not covered by the EIL form because they are not timely. First, Evanston argues that Talbert first discovered GES was separating lead and handling hazardous materials at the property on May 22, 2015, two months before the inception of the Policy. (Mot Summ. J., Dkt. 66, at 13). Second, Evanston contends that Talbert did not report the lead contamination in writing until November 6, 2015, more than 21 days after he discovered the pollutants. (Id. at 13-14). But HLT disputes Evanston's timeline. According to HLT, Talbert did not discover the pollution condition until October 27, 2015, when HLT was notified about the sand piles. (Resp. Mot. Summ. J., Dkt. 76, at 10). Thus, according to HLT, no pollution condition existed in May 2015 because no pollutants were "discharged" until around October 27, 2015. (Id. at 11; Talbert Dep., Dkt. 76-1, at 12:3-25, 13:12-15).
There is a dispute of material fact as to whether its report to Evanston and subsequent claim were timely filed. It is not disputed that HLT filed a notice for a claim on October 27, 2015. (Mot. Summ. J., Dkt. 66, at 3; Resp. Mot. Summ. J., Dkt. 76, at 10; Talbert Dep., Dkt. 66-11, at 5:7-12). Accordingly, under HLT's version of the facts, Talbert discovered the handling of hazardous materials in May, but he did not believe it was an environmental claim because they were not mishandling it. (Talbert Dep., Dkt. 76-1, at 14:7-23). Talbert testified that it was not until October that he believed he had an environmental claim based on the uncontained materials. (Id. at *735 18:8-19:4). Merely handling hazardous material does not indicate that the lead contamination occurred; Talbert testified to the contrary. (Talbert Dep., Dkt. 66-11, at 8:1-15 ("by May 25th they're cleaning up, and they provided me with the certificate of insurance.")). Rather, the insurance policy requires a "discharge, dispersal, seepage, migration, release or escape of 'pollutants.' " (Ins. Policy, Dkt. 66-3, at 87, ¶ (NN)). There is no evidence, however, that any such discharge occurred before October 27.
Evanston next argues that the EIL coverage form is not implicated because the damage to the Property, occurring over several months during GES's ongoing business operations, was neither "sudden" nor "abrupt." (Mot. Summ. J., Dkt. 66, at 14). To be sudden, an event must occur "abruptly, precipitantly or brought about in a short time." Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. , 89 N.Y.2d 621, 657 N.Y.S.2d 564, 679 N.E.2d 1044, 1047 (1997). Discharges that occur over a period of time are, by definition, not "sudden." See Ogden Corp. v. Travelers Indem. Co. , 924 F.2d 39, 42 (2d Cir. 1991). Coverage, however, would not necessarily be negated if such a discharge continued undetected for some period of time, even if continued release could no longer be considered "sudden." Northville Indus. Corp. , 657 N.Y.S.2d 564, 679 N.E.2d at 1048.
Evanston argues that HLT visited the Property and discovered hazardous materials on May 21, 2015. (Mot. Summ. J., Dkt. 66, at 14). Based on the TCEQ investigation report, Evanston argues that the pollution condition was incremental due to GES's employees' ongoing process of separating out the lead-bearing parts of the recycled CRTs. (Id. at 14-15).
Drawing all inferences in HLT's favor, there is a dispute of material fact regarding whether the pollution condition was sudden and abrupt. HLT alleges that GES was removing leaded glass for disposal off-site, and that the remaining ground glass did not contain lead. (Resp. Mot. Summ. J., Dkt. 76, at 12). And Talbert testified that the sand tested as clean before October and that the sand was contained. (See Talbert Dep., Dkt. 76-1, 18:16-19:4). GES may have been handling hazardous materials, but that does not indicate that the pollution condition was present before October.
Evanston argues that two exclusions preclude coverage for HLT's damages under the EIL coverage form: the known conditions exclusion and the "your property - damage or cleanup costs" exclusion. (Mot. Summ. J., Dkt. 66, at 8).
a. Known Conditions Exclusion
Evanston argues that the known conditions exclusion precludes recovery for HLT's damages under the EIL form. (Mot. Summ. J., Dkt. 66, at 15). The known conditions exclusion precludes coverage for any damages arising out of pollutions conditions that existed before the policy period inception date or that were known to the insured at any time before the policy period began. (Ins. Policy, Dkt. 66-3, at 76, ¶ (J)).
Evanston repeats its argument that because GES began recycling operations in April 2015-three months before the inception date of the Policy-the pollution condition caused by the lead-bearing glass existed before the beginning of the policy period. (Mot. Summ. J., Dkt. 66, at 15). According to Evanston, Talbert testified that he discovered GES's manual, lead-separating operations in May 2015 and sent a notice of default to GES. (See Talbert Dep., Dkt. 66-11, at 7:3-12, 13-15; Pl.'s Objs., Ans., & Resps. to Def.'s Interrogs., Dkt. 66-17, at 10).
*736 As already stated, there is no evidence that the pollution condition existed before the Policy's inception date. Talbert testified that when he visited the Property on May 21, he was concerned: "the place was messy. There was stuff outside, racks - big metal storage racks outside and boxes just sitting outside that should have been inside." (Talbert Dep., Dkt. 66-11, at 6:16-7:2). But it was not until the October 27 visit that Talbert found the sand outside the building and "broken class everywhere." (Id. at 11:4-24). The evidence is at best unclear whether the pollution condition existed before October 27, which is insufficient for Evanston to show that the exclusion applies at this stage.
b. Your Property - Damage or Cleanup Costs Exclusion
Finally, Evanston argues that the "your property - damage or cleanup costs" exclusion precludes coverage under the EIL form. (Mot. Summ. J., Dkt. 66, at 16). The "your property - damage or cleanup costs" exclusion precludes recovery for any claim "[c]aused by, arising out of or in any way related to 'property damage' or 'cleanup costs' for property owned, leased or operated by [GES], or property in [GES's] care, custody or control, even if any cost is incurred or expended to avoid or mitigate further damage or 'claims.' " (Ins. Policy, Dkt. 66-3, at 77, ¶ (Y)). Because HLT seeks to recover reimbursement of costs to remediate and repair its property after the TCEQ discovered hazardous levels of lead from GES's operations, Evanston contends that the "your property - damage or cleanup costs" exclusion precludes recovery. (Mot. Summ. J., Dkt. 66, at 16).
As the Court has already explained, several district courts in the Second Circuit have found that exclusions precluding coverage for damage to property owned by the insured do not apply where cleanup of an insured's property is required to prevent damage to property of a third party or to protect public health. Olin Corp. , 332 F. Supp. 3d at 843-44 (citing cases). The purpose of this requirement is to incentivize swift cleanup of pollution and avoid delaying remediation until it affects third-party property. Id. (quoting Savoy Med. Supply Co. , 776 F. Supp. at 708 );
HLT relies on this rule in seeking recovery under the EIL coverage form. It argues that its costs were a result of a TCEQ requirement to clean up pollutants in order to protect the public health. (Resp. Mot. Summ. J., Dkt. 76, at 7). Thus, according to HLT, its damages are not precluded under the "your property - damage or cleanup costs" exclusion under New York law. Evanston argues that this exclusion operates to exclude all costs, however, regardless of whether HLT incurred them to prevent damage to third parties or the public health. (Reply Mot. Summ. J., Dkt. 91, at 10-11). Unlike the damage-to-property exclusion under the CGL form, Evanston notes that this damage-to-property exclusion explicitly precludes coverage related to property damage or cleanup costs "even if any cost is incurred or expended to avoid or mitigate further damage." (Reply Mot. Summ. J., Dkt. 91, at 10; Ins. Policy, Dkt. 66-3, at 77, ¶ (Y)).
The Court disagrees. First, fairly read as a whole, the contract's use of "further damage" can be construed to refer to mitigating further damage to the property owned, leased or operated by GES. The damage-to-property exclusion precludes recovery for "property damage" or "cleanup costs" for property owned, leased, or operated by GES. The clause continues, specifying that recovery is precluded "even if any cost is incurred or expended to avoid or mitigate further damage." (Ins. Policy, Dkt. 66-3, at 77 ¶ (Y) (emphasis added)). That second clause *737 modifies the first; in order to avoid or mitigate further damage, the implication is that some damage must have already occurred. That phrase thus refers to mitigating damage to property owned, leased, or operated by GES. At best, the clause is ambiguous, so it is construed in HLT's favor and is insufficient to grant summary judgment. See Palmieri , 445 F.3d at 187. Second, HLT sought to mitigate damage to third parties and prevent a threat to public health and safety. The insurance policy does not explicitly negate the general rule under New York law that damage-to-property exclusions do not apply where cleanup is required to prevent damage to protect public health. See Olin Corp. , 332 F. Supp. 3d at 843-44.
Accordingly, making an Erie guess as to what New York courts would hold, the Court finds that the "your property - damage or cleanup costs" exclusion does not preclude HLT's claim seeking to recover its damages incurred as a result of cleaning up the sand piles. Because the cleanup of the sand piles was required to prevent damage to third parties, the exclusion would not prevent HLT from recovering its related costs from Evanston under New York law.
D. Attorney's Fees
Evanston argues that HLT is not entitled to seek reimbursement of the attorney's fees it incurred to retain environmental counsel during the remediation of the Property and in retaining counsel in the Bankruptcy Action. Evanston contends that its duty only extends to fees incurred defending claims, not prosecuting them. (Mot. Summ. J., Dkt. 66, at 7; see also Ins. Policy, Dkt. 66-3, at 40, ¶ (I)(1)(a), (b)). As a result, Evanston argues that the fees HLT incurred in responding to the TCEQ investigation did not involve a suit and HLT's fees incurred in prosecuting claims against GES in the bankruptcy court are not covered.
HLT does not respond to Evanston's argument that HLT is not entitled to attorney's fees for its costs incurred during remediation of the Property, its appearance in GES's bankruptcy, or costs incurred in prosecuting this case. (See Reply Mot. Summ. J., Dkt. 91, at 2; see generally Resp. Mot. Summ J., Dkt. 76). A plaintiff abandons a claim when she does not respond to a dispositive motion's arguments attacking it. See, e.g. , Black v. N. Panola Sch. Dist. , 461 F.3d 584, 588 n.1 (5th Cir. 2006) ; Parga v. ADT Sec. Servs. , No. EP-15-CV-9-DB, 2016 WL 8919154, at *5 (W.D. Tex. Mar. 22, 2016). Accordingly, HLT has abandoned its claim for attorney's fees incurred in the remediation process, GES's bankruptcy action, or in the prosecution of this case.[8]
IV. CONCLUSION
For the reasons given above, IT IS ORDERED that Evanston's Motion for Summary Judgment, (Dkt. 66), is GRANTED IN PART . The Motion is DENIED with respect to HLT's breach of contract claim to the extent HLT seeks to recover damages under the EIL coverage form for costs incurred in remediating the Property as required by the TCEQ. The motion is GRANTED with respect to all other claims asserted by HLT.
IT IS FURTHER ORDERED that Evanston's Motion to Strike, (Dkt. 92), is MOOT .

Evanston filed its motion for summary judgment and motion to strike together with Defendant Markel Service, Incorporated ("MSI"). Plaintiff HLT Properties, LLC ("HLT") voluntarily dismissed with prejudice its claims against MSI on April 1, 2019, MSI is no longer a party to this action. (Dkt. 87).

GES filed for Chapter 7 Bankruptcy on November 2, 2015. (Am. Compl., Dkt. 54, at 5); see In re: Global Environmental Servs., LLC , No. 15-52141 (Bankr. E.D. Ky.).

In its complaint, HLT argues that it is entitled to assert a breach of contract claim as a "named insured, intended third party beneficiary and/or additional insured," (Am. Compl., Dkt. 54, at 7 ¶ 25), and that "Plaintiff has obtained a judgment against GES and is entitled to payment of its claims" from Evanston. (Id. at 8). HLT now solely focuses on its status as a third-party judgment creditor, (Resp. Mot. Summ. J., Dkt. 76, at 4 & n.19). HLT limits its argument to one line in a footnote: "To the extent relevant, GES was obligated to perform certain tasks set forth in the lease agreement attached to Evanston's Motion, creating, at minimum, fact issues precluding summary judgment on the additional insured issue." (Id. ). HLT never identifies what those obligations were or how they establish that HLT qualifies as an additional insured. "Arguments subordinated in a footnote are 'insufficiently addressed in the body of the brief,' and thus are waived." Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp. , 810 F.3d 335, 339 n.4 (5th Cir. 2016) (quoting Bridas S.A.P.I.C. v. Gov't of Turkm. , 345 F.3d 347, 356 n. 7 (5th Cir. 2003) ).

Neither party disputes that lead is a pollutant.

Evanston argues that HLT is judicially estopped from seeking additional damages unrelated to the sand piles after representing to the bankruptcy court that its damages were limited to the remediation costs for pollution at the Property. (Reply Mot. Summ. J., Dkt. 91, at 6). The bankruptcy court broadly permitted HLT to "contact and assert a claim and receive payment ... from the Debtor's insurance company relating to any covered loss as defined in any applicable insurance policy to the extent of any applicable insurance coverage." (Bankr. Order, Dkt. 66-5, at 2 (emphasis added)). Accordingly, the question for this court remains the same: whether HLT's damages are covered under the Policy.

Evanston argues that HLT's damages are further precluded from CGL coverage under the lead and silica exclusions. (Mot. Summ. J., Dkt. 66, at 11-12; see Ins. Policy, Dkt. 66-3, at 17 ¶ (2) ("This insurance does not apply to: ... 'property damage' ... arising out of or contributed to in any way by lead, ... or any other material or substance containing lead."); Ins. Policy, Dkt. 66-3, at 19 ¶ (8) (noting that the Policy does not apply to property damage arising from "silica" or "silica-mixed dust")). Like the total pollution exclusion, HLT appears to concede that these exclusions preclude recovery for costs incurred in cleaning up the sand piles, but not for cleaning up or remediating the building itself. (Resp. Mot. Summ. J., Dkt. 76, at 9-10). The remaining property damage, however, is barred by the damage-to-property exclusion, to the extent it is not already barred by total pollution exclusion, for reasons already stated.

Pollutants are "any solid, liquid, gaseous, biological or thermal irritants or contaminants, including but not limited to smoke, vapors, soot, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, waste materials, including medical, infectious and pathological waste, legionella pneumophila, electromagnetic fields, 'low level radioactive waste' and 'mixed waste' materials, at levels in excess of those naturally occurring. Waste includes materials to be recycled, reconditioned or reclaimed." (Ins. Policy, Dkt. 66-3, at 87, ¶ MM).

The Court does not address whether HLT may recover attorney's fees in prosecuting this action for breach of contract under Chapter 38 of the Texas Civil Practices and Remedies Code. (See Am. Compl., Dkt. 54, at 9, 13).